*Walter Elenils Portillo Funes v. State of Maryland*, No. 65, September Term, 2019. Opinion by Getty, J.

**CRIMINAL LAW—DRIVING WHILE IMPAIRED—DRIVING UNDER THE INFLUENCE—IMPLIED CONSENT—ADVICE OF RIGHTS—DR-15 FORM—FOREIGN LANGUAGE ADVISEMENT**

The Court of Appeals held that, when providing advice of rights prior to administering a chemical breath test, police officers must use methods that reasonably convey the warnings and rights in the implied consent statute, § 16-205.1 of the Transportation Article of the Maryland Code. A police officer read in English a DR-15 Advice of Rights form to Petitioner, a native Spanish speaker. The officer failed to read the DR-15 form in Spanish and/or utilize several Spanish language translation resources available to him, even after it became abundantly clear that Petitioner had limited English proficiency. A driver's inability to understand English and consequent inability to comprehend the advice of rights is a factual issue when presented in a motion to suppress. Whether the actions of the officer reasonably conveyed the warnings and rights in the implied consent statute is an issue of fact to be determined by the suppression court.

**CRIMINAL LAW—DRIVING WHILE IMPAIRED—DRIVING UNDER THE INFLUENCE—STANDARDIZED FIELD SOBRIETY TESTS—ADMISSIBILITY—MARYLAND RULE 5-701—LAY WITNESS TESTIMONY**

The Court of Appeals held that the trial court did not abuse its discretion when it admitted the lay testimony of a police officer that administered in English standardized field sobriety tests to a driver with limited English proficiency. The jury was entitled to consider the weight of that evidence.

**CRIMINAL LAW—DRIVING WHILE IMPAIRED—DRIVING UNDER THE INFLUENCE—STANDARDIZED FIELD SOBRIETY TESTS—MARYLAND RULE 5-403—UNFAIR PREJUDICE**

The Court of Appeals held that the trial court did not abuse its discretion when it admitted body camera footage and the testimony of a police officer over the driver's objection that the evidence was unduly prejudicial under Maryland Rule 5-403. Where the testimony and video footage are relevant evidence, it is not unduly prejudicial merely because there is an innocent explanation for the actions of the driver. The driver was able to address the innocent explanation on cross-examination and the jury was entitled to consider the weight of the evidence.

**CRIMINAL LAW—DRIVING WHILE IMPAIRED—DRIVING UNDER THE INFLUENCE—STANDARDIZED FIELD SOBRIETY TESTS—EQUAL PROTECTION—EXCLUSIONARY RULE**

The Court of Appeals refused to apply the Exclusionary Rule to Equal Protection challenges to the admission of evidence in this case.

Circuit Court for Montgomery County
Case No. 135651C
Argued: May 11, 2020

IN THE COURT OF APPEALS

OF MARYLAND

No. 65

September Term, 2019

_____

WALTER ELENILS PORTILLO FUNES

v.

STATE OF MARYLAND

_____

Barbera, C.J.
McDonald,
Watts,
Hotten,
Getty,
Booth,
Biran,

JJ.

_____

Opinion by Getty, J.

_____

Filed: June 30, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

In the 1950s and 1960s, many states, including Maryland,[1] passed "implied consent" laws to encourage suspected drunk drivers to submit to chemical testing. These statutes are based on the rationale that a condition precedent for the privilege of driving on a state road is a driver's consent to permit chemical testing whenever properly requested. If the driver refuses the test, the driver is deemed to have withdrawn his or her consent, which results in a violation of the condition precedent to a license. Thus, the state revokes the conditional privilege of driving. Maryland's current implied consent statute says that, by driving on Maryland's roads, a driver has consented to taking a chemical test when properly requested. After a police officer gives sufficient "Advice of Rights," a driver must choose between submitting to chemical testing or refusing and incurring administrative penalties. In most cases, an officer must merely read in English an "Advice of Rights" form, identified and commonly referred to as a DR-15 form, to provide sufficient advice of rights. Certain circumstances, however, can render advice of rights insufficient, even when the officer reads a DR-15 form. Today, we must decide if reading that form in English to a driver with limited English proficiency is such a circumstance.

In the early morning hours of October 14, 2018, police officers found Petitioner Walter Elenils Portillo Funes asleep at the wheel of his truck. The officers brought Mr. Portillo[2] to the station after he failed several field sobriety tests. An officer read in English

___

[1] 1969 Md. Laws, ch. 158.

[2] The record does not specify Petitioner's preferred surname. Because his counsel refers to Petitioner as "Mr. Portillo," we will do the same.

the DR-15 form to Mr. Portillo, who speaks Spanish. Mr. Portillo, by signing the DR-15 form, agreed to take a breath test, which he failed. The State charged Mr. Portillo by citation with various drunk driving offenses.

Before trial, Mr. Portillo moved in limine to exclude the field sobriety tests and the breath test. According to Mr. Portillo, he did not understand the field sobriety test instructions or the advice of rights because he has limited English proficiency. Without hearing any evidence, the trial court denied the motions, stating that the English comprehension issue was a matter of weight, not admissibility. At trial, the State presented as evidence the field sobriety tests and breath test. Mr. Portillo, on cross-examination, challenged the weight of that evidence on grounds that he does not understand English. Unconvinced, the jury convicted Mr. Portillo of several drunk driving crimes.

Because the trial court never ruled on the sufficiency of the advice of rights, Mr. Portillo brings that question before us in the context of the implied consent statute. We hold that, in giving advice of rights, officers must use methods that reasonably convey the warnings and rights in the implied consent statute. The officer in this case did not use reasonable methods. We will reverse and remand for a new trial at which the breath test evidence must be suppressed.

## BACKGROUND

### A. *Roadside Stop & Standardized Field Sobriety Tests.*

On the morning of October 14, 2018, shortly before 6:00 a.m., Montgomery County Police Officer Devon Sharkey was driving southbound on New Hampshire Avenue on his way to work when he observed a red pickup truck stopped in the right-most northbound

lane.  Officer Sharkey made a U-turn and pulled behind the truck.  What happened next was captured by Officer Sharkey's body camera.

The truck's brake lights were on, and when he approached the passenger side on foot, Officer Sharkey noticed that the keys were in the ignition, the engine was running, and the gearshift was in drive.  The driver, later identified as Mr. Portillo, had his foot on the brake pedal and was "slumped over the wheel, apparently not awake."  An open can of Corona beer sat in the cup holder in the center console.

After backup arrived, the police woke Mr. Portillo, removed him from his vehicle, and escorted him to the sidewalk where he was able to stand without assistance.  According to Officer Sharkey, Mr. Portillo gave off "a consistent strong odor of alcoholic beverage" and had "bloodshot watery eyes."  Returning to the truck, officers found two additional cans of beer, one empty in the compartment along the driver's door and one unopened on the front passenger floorboard.  Illuminated by streetlight, Officer Sharkey conducted standardized field sobriety tests at Mr. Portillo's location on the sidewalk.  Officer Sharkey, a five-year veteran of the Montgomery County Police Department, began by asking background questions to Mr. Portillo.  It quickly became apparent that English was not the primary language of Mr. Portillo.  Asked where he was coming from, Mr. Portillo, who spoke with a heavy accent, responded, "El Salvador."  When Officer Sharkey clarified that he meant "this particular evening or morning," Mr. Portillo again said "El Salvador."

Concerned that "there may be a language barrier" and that Mr. Portillo did not speak English, Officer Sharkey contacted dispatch to make arrangements for someone to speak to Mr. Portillo in Spanish.  He learned from dispatch that there was a translator available

3

in the county who was "a distance away." Officer Sharkey later admitted at trial that he could have utilized Language Line, a telephonic translation service available to the police department. He opted not to call Language Line or wait for a translator to arrive and "went ahead." According to Officer Sharkey, he decided not to use a translator because Mr. Portillo "insist[ed] that he understood English."

Footage from the officer-worn body cameras showed that Mr. Portillo was confused. During questioning, Mr. Portillo struggled to answer basic questions posed in English, including where he was located and where he was coming from. He was only able to respond to inquiries into how much he had to drink, where he lived, and whether he had a driver's license when an officer translated those questions into Spanish. Even then, he spoke in a mixture of broken English and Spanish.

When the police asked Mr. Portillo, in English, when he last drank alcohol, he responded "I don't speak English" and asked the police to "speak in Spanish." An officer replied, "Let me explain something to you. If you don't cooperate and answer our questions, you're just going to go in handcuffs and be arrested right now." Mr. Portillo replied, "Oh, my God." The officer then turned away and asked another officer which of them was going to administer the field sobriety tests. The officer to whom he was speaking responded, "It don't matter to me. Let's get this ball rolling." When the first officer explained that "we're waiting for a translator," the other officer stated, "Well, there isn't one."

Mr. Portillo protested repeatedly that "[m]y language is Spanish." At one point, he told an officer, "I don't like anybody, okay." When the officer asked him whether that was

4

true, Mr. Portillo responded, "No, because my language is Spanish." Asked whether he spoke English, Mr. Portillo then gave a qualified and confusing response: "I speak English and I speak Spanish. I don't like anybody."

Proceeding in English notwithstanding his initial concerns, Officer Sharkey asked Mr. Portillo whether he had any medical conditions that could affect his balance, movement, or eyesight; whether he was diabetic, epileptic, or had seizure conditions; whether he was on any medications; and whether he wore contact lenses or eyeglasses. During this time, Officer Sharkey also asked Mr. Portillo multiple times to take his hands from his pockets but was met with blank stares and nonresponsive answers (e.g., "Let me know").

For the field sobriety tests, Officer Sharkey began with the horizontal gaze nystagmus ("HGN") test, which tracks involuntary movement of the pupils. At trial, Officer Sharkey explained the instructions he provides to individuals undergoing the HGN test:

> So, first, we will instruct the participant to stand straight and tall, feet together. Hands straight down at the sides, instruct the individual to follow the movement. I would hold a pen with my finger towards the top of it. I ask them to follow the tip of that pen and move their eyes only, do not move their head while they're following it and, just go through a series of tracking the pupils normally to see if they're moving together and then check different ranges of motion from the center to the sides.

Because Mr. Portillo did not object or ask questions in response to the instructions, Officer Sharkey proceeded with the HGN test, observing six of six possible "clues," or signs Mr. Portillo may have consumed alcohol. The video footage of the HGN test shows that Officer Sharkey had to remind Mr. Portillo of the instructions multiple times, at one

5

point saying, "I keep repeating because you're not doing it. You understand that? You said you understood but you're not doing it."

Officer Sharkey next administered the "walk-and-turn" test. As with the HGN test, the walk-and-turn test begins with a series of verbal instructions. At trial, Officer Sharkey described the instructions:

> The instructions are to stand straight and tall, facing the front, hands down at the sides, to place the right foot in front of the left, heel to toe, and to stay in that position, listening to the instructions and watching a demonstration.
> Furthermore, from that stance, the individual is to look down at their feet, maintaining heel to toe positioning, taking a series of nine steps in one direction, looking down, counting out loud each step while they're looking down at the foot, maintaining the heel to toe contact, walking on an imaginary straight line.
> After those first nine steps, they plant the lead foot, take a series of small steps to turn around and then come back along that same imaginary line to finish up with the second set of nine steps in the same way. Once they start, they do not stop until they are finished with the test.
> After giving those instructions, I demonstrate with a series of three steps, turned around, three more steps and explained that I only did the three but they are to do the nine steps each way.

Officer Sharkey had to ask Mr. Portillo multiple times if he understood the instructions. At times, Mr. Portillo responded affirmatively ("Yes, sir"). Other times, he gave nonresponsive answers (e.g., Q: "Do you understand, yes or no?" A: "One.").

Mr. Portillo performed poorly on the walk-and-turn test, starting too early, putting his arms up, failing to maintain contact between his heels and toes, failing to walk in a straight line, and making an improper turn. Mr. Portillo took twelve steps, rather than nine, counting to thirteen in English as he did so. Officer Sharkey testified that he observed seven of eight clues during the test.

6

The final test was the "one-leg stand" test. Mr. Portillo appeared not to understand Officer Sharkey's request that he return to the illuminated area to take the test, so another officer had to take him by the arm and point to where he needed to go. Officer Sharkey then gave Mr. Portillo the following instructions, as described at trial:

> The instructions are to stand straight; feet together, arms down at the sides, to choose one leg, whichever one he wants, to lift one foot approximately six inches off the ground, [] say about the length of [a] dollar bill just for visual, to hold the leg straight, keep the foot parallel to the ground, looking down at the foot, count out loud, one thousand one, one thousand two and so on until I tell him to stop.

Not asking any questions, or even waiting for Officer Sharkey to finish the instructions, Mr. Portillo took steps backwards as if he thought he needed to do a reverse walk-and-turn test. He then continued to display confusion, putting his arms up with palms out, shrugging his shoulders, and looking to the other officers. In response, Officer Sharkey inquired of Mr. Portillo, "Did you understand what I said because you did something way different?" After Officer Sharkey demonstrated how to do the test, Mr. Portillo made an attempt to comply, but expressed confusion over which foot to raise, put his foot down too early, used his arms to maintain balance, and swayed. Officer Sharkey testified that he observed three of four clues during the test. Based on Mr. Portillo's performance during the field sobriety tests, Officer Sharkey believed him to be impaired, placed him under arrest, and transported him to the police station.

## B. *Chemical Breath Test.*

At the police station, Officer Sharkey read to Mr. Portillo in English from the DR-15 "Advice of Rights" form that had a Spanish translation printed on the back. Officer

7

Sharkey gave Mr. Portillo an "identical" version of the form to follow along, although he admitted that he did not pay attention to whether Mr. Portillo was able to do so. While he read the form, Officer Sharkey's body cam mostly showed the form blocking Mr. Portillo's face. At times, Mr. Portillo's face is visible and he is looking down or at the wall. It is unclear whether Mr. Portillo was reading the form on the table in front of him.

Officer Sharkey described the DR-15 as containing "a lot to read" and "very long, tedious information." Indeed, the DR-15 is a lengthy, single-spaced form that explains, in great detail, an individual's right to withdraw consent to a breath test, as well as the penalties associated with certain test results, the criminal and administrative consequences of declining the test, the individual's administrative rights to challenge those consequences, and other matters.[3] All of these advisements are translated into Spanish on the back of the form. The English side of the form includes at the bottom several important sentences translated into Spanish. Those sentences certify that the officer "advised the driver of the above stated rights and sanctions" in "English and Spanish":

> **Certification:** I, the Undersigned Police Officer, certify under the penalties of perjury, that I have advised the driver of the above stated rights and sanctions and have provided the driver with the aforementioned advice in: English and Spanish.

> **Certificación:** Yo, el oficial de policía abajo firmante, certifico bajo pena de perjurio que he aconsejado al conductor acerca de sus derechos y sanciones arriba mencionados, y que le he proporcionado la notificación arriba mencionada al conductor en: inglés y español.

---

[3] The DR-15 form as it currently exists is attached as an appendix to this opinion.

8

After a line for the officer's signature, the document provides, in English and Spanish, a driver acknowledgment statement and agreement selections:

> **Read before Signing: I, the undersigned driver**, acknowledge that I have been read or I have read the above stated Advice of Rights as certified by the police officer. I understand that this requested test is in addition to any preliminary tests that were taken.
>
> **Leer Antes de Firmar: Yo, el conductor abajo firmante**, reconozco que me han leído o he leído la Notificación de Derechos arriba mencionada según lo certifica el oficial de policía. Comprendo que esta prueba solicitada es adicional a cualquier prueba preliminar que se haya realizado.
>
> Having been so advised, do you now agree to submit to a test? (Officer check driver's reply)
>
> Habiendo sido de este modo notificado, está Usted de acuerdo ahora en someterse a la prueba? (Oficial, revise la respuesta del conductor)
>
> ❏ Yes - Agree to submit to an alcohol concentration test
>  Sí - Acepta someterse a una prueba de concentración de alcohol en la sangre
>
> ❏ No - Alcohol concentration test, refused
>  No - La prueba de concentración de alcohol en la sangre ha sido rechazada

At the very bottom of the page is a line for the driver to sign and date.

According to Officer Sharkey, it took Mr. Portillo "several minutes" to decide whether to take the breath test. During that time, Mr. Portillo continued to exhibit confusion. When Officer Sharkey asked him whether he would submit to the breath test, Mr. Portillo responded in broken English, "This one. We not bother you guys tell me. We do." Likewise, when asked to confirm whether he wanted to take the test, Mr. Portillo said, "I don't know what it is, you know." Ultimately, Mr. Portillo signed the form, promising "to be good," after Officer Sharkey urged him to decide "faster" and told him that he could

9

"go home" and not to jail if he took the test. After Mr. Portillo signed the DR-15, Officer Sharkey brought in Sergeant Douglas Miller to administer the breath test, which he conducted with an Intoximeter.[4] The machine registered an alcohol concentration of 0.15, nearly twice the legal limit of .08.

The State charged Mr. Portillo with driving under the influence of alcohol, driving while impaired by alcohol, driving under the influence of alcohol per se, and negligent driving. On April 16, 2019, Mr. Portillo was convicted in the District Court of Maryland sitting in Montgomery County. Mr. Portillo noted an appeal to the Circuit Court for Montgomery County.

## C. *Pretrial Motions to Exclude the Breath and Field Sobriety Tests.*

One day before the scheduled circuit court trial, Mr. Portillo filed two motions—styled as "Motions in Limine"—the first to suppress the chemical breath test evidence and the second to suppress evidence of the field sobriety tests. Mr. Portillo argued that exclusion of the breath test was required because he did not understand English and thus the advisement of his rights in English rendered his submission to the test involuntary and in violation of Courts and Judicial Proceedings Article ("CJ") § 10-309 and Transportation

---

[4] An Intoximeter is the instrument officers use to determine the alcohol concentration of suspected drunk drivers. *See Motor Vehicle Admin. v. Smith*, 458 Md. 677, 683 n.5 (2018) ("An intoximeter is '[a] non-portable instrument for measuring the alcohol content of a person's breath, especially in cases of suspected drunken driving, usually sited at a police station.' Intoximeter definition, English Oxford Dictionary, https://en.oxforddictionaries.com/definition/intoximeter, archived at https://perma.cc/WRN4-224Y"). Only certain officers are certified to administer Intoximeter tests. According to Sergeant Miller, certification requires a 40-hour class and yearly in-service training. Mr. Portillo did not challenge Sergeant Miller's certification.

Article ("TR") § 16-205.1 of the Maryland Code.[5] The motion to exclude evidence of the field sobriety tests was similarly grounded in Mr. Portillo's inability to understand English, which, he argued, rendered the results of the tests unreliable. He further argued that the administration of the field sobriety tests in English violated his constitutional right to equal protection.

The parties gathered for a Maryland Rule 4-252 motions hearing and one-day trial on June 24, 2019. At the hearing the State made, and the circuit court granted, a motion for postponement. On the morning of the new trial date, July 22, 2019, the State filed an opposition to Mr. Portillo's motions to suppress the field sobriety tests and chemical breath test. In its opposition, the State mainly addressed a claim Mr. Portillo did not raise: whether the police had probable cause to arrest him for driving under the influence. The State also argued that whether Mr. Portillo understood English was "a factual issue to be determined by the factfinder, which in this case is the jury," and that evidence of the breath test was admissible because the police advised Mr. Portillo of his rights using the appropriate DR-15 form.

Before the trial began, the circuit court first heard arguments on suppression of the field sobriety tests at which defense counsel offered to present evidence in support of his motions:

---

[5] Mr. Portillo also argued in this motion and at trial that the breath test should be excluded because the officers failed to adhere to the required 20-minute observation period prior to administering the test. *See* COMAR 10.35.02.08(G)(1)–(2). That argument is not at issue in this appeal.

11

[DEFENSE COUNSEL]: . . . And I just wanted to flag for Your Honor, if, after I give the argument, Your Honor is interested in hearing any testimony from the officers about this case or seeing any of the video that backs it up, I'm happy to provide that.

THE COURT: I don't know what you mean. This is your motion in limine, and so if you want to make your arguments you do, it is not typically evidentiary in nature. It's not what the Court wants, it's how you want to present—how you must present your case, so what is your argument for suppression of the field sobriety tests?

[DEFENSE COUNSEL]: Yes, Your Honor. The field sobriety test, the fundamental problem with the field sobriety test is that they were provided —they were administered to Mr. Portillo in English although he speaks Spanish. He objected several times when—

THE COURT: And that goes to the weight. That, you can argue at cross. What else is your reason for suppression of the field sobriety test?

Defense counsel proceeded to argue the points from his written motion, which the court

denied:

THE COURT: Okay. As I indicated earlier, any issues concerning the individual's ability to understand are going to be issues for you to explore on cross-examination. I do find that there is a rational basis to permit the officer['s] testimony concerning his observations during the field sobriety tests are admissible. You are always free to cross on his training and experience. Next?

Defense counsel then argued for suppression of the breath test, again repeating the grounds

argued in his written motion. The court denied that motion as well:

THE COURT: All of your arguments go to weight, and in terms of the admissibility, if he did not understand the DR-15 and you are able to establish that, certainly, at that point, you can move to suppress at that point, but, as a matter of ruling on this preliminarily, your objections are overruled. . . .

The case immediately proceeded to trial.

### D. *Trial and Appeal.*

At trial, the State presented two witnesses, Officer Sharkey, who administered the field sobriety tests and read the DR-15 form, and Sergeant Miller, who administered the breath test.[6] The State also played several clips from the officers' body cameras. When prompted by the court, defense counsel stated that he had "no objection" to the testimony of Officer Sharkey or the admission of the body camera footage. On cross examination, defense counsel played several clips from the body camera footage.

Mr. Portillo renewed his motions to suppress during Officer Sharkey's testimony and again when the State offered the results of the breath test into evidence during Sergeant Miller's testimony. On the former occasion, the court restated its conclusion that "your particular arguments go[] to weight, not the admissibility of it." On the latter, the court declared that it did not "have any evidence that [Mr. Portillo] didn't understand any language" and criticized defense counsel for not seeking a pretrial hearing on what the court characterized as "a motion to suppress" and not "a motion in limine." The court then denied the motion to suppress the breath test a final time, stating:

> [I]n terms of your motion to suppress at this juncture, your arguments are based upon his failure to understand.
> I have no evidence to that effect. All I have is the State's Attorney's Office, their witnesses saying this is what they did, and I don't have—that's a question of whether or not you want to argue is different and before the jury that he didn't understand the instructions, but, at this preliminary stage in the motion to suppress, I find that there is sufficient evidence to permit the State to use the evidence and then your arguments are really the subject of argument. So I'm not suppressing the breath test.

---

[6] A spoken language interpreter was present at trial.

13

At the conclusion of the State's case, Mr. Portillo moved for, and the court granted, judgment of acquittal for the negligent driving charge, but denied the motion as to the other three charges. At the close of all evidence, Mr. Portillo renewed his motion for judgment of acquittal as to the three remaining charges, and the court again denied that motion. The jury returned a verdict of guilty on all three remaining charges: driving under the influence of alcohol, driving while impaired by alcohol, and driving under the influence of alcohol per se. A month later, the court sentenced Mr. Portillo to one year with all but eight days suspended in favor of two years' probation.

We granted Mr. Portillo's petition for writ of certiorari to consider two questions:

1. Did the circuit court err in denying Mr. Portillo's motion to exclude the chemical breath test, where Spanish-speaking Mr. Portillo was advised of his right to decline the test in English?

2. Did the circuit court err in denying Mr. Portillo's motion to exclude the standardized field sobriety tests, where Mr. Portillo was a Spanish speaker but the tests were performed in English?

For the reasons below, we answer the first question in the affirmative and reverse. On the second question, we answer in the negative and affirm. The case will be remanded to the Circuit Court for Montgomery County for a new trial where the breath test evidence, but not the field sobriety test evidence, must be suppressed.

**DISCUSSION**

*A.*    *Breath Tests.*

The circuit court denied Mr. Portillo's motion to exclude the breath tests, concluding that any issues with his lack of understanding the advice of rights form goes to the weight

14

of the evidence and not to admissibility. We disagree and will reverse and remand. The court erred by failing to hear evidence on the sufficiency of the advice of rights.

*1. Parties' Contentions.*

Mr. Portillo contends that the circuit court erred in admitting the chemical breath test into evidence because he was not fully advised of his rights as required under the implied consent statute. Mr. Portillo advocates for this Court to adopt a standard requiring police officers to advise drivers of their rights in a language that the driver speaks and understands. Because Officer Sharkey read aloud the DR-15 form in English, Mr. Portillo maintains that he was deprived of his right to knowingly and voluntarily consent to the chemical breath test. According to Mr. Portillo, adopting a standard which requires officers to verbally communicate the advisements of the DR-15 form in a language the driver understands is the only standard which pays "the most respect to the dignity of the non-English speaking individuals."

The State responds that because Officer Sharkey provided Mr. Portillo a copy of the DR-15 that contained the advisements in both English and Spanish to read to himself there is no factual basis for Mr. Portillo's contention that he did not understand the DR-15 form advisements. The State further contends that this Court does not need to address whether the implied consent statute requires police officers to advise drivers in a language they are able to speak and understand. If this Court chooses to address this question, the State advocates for a standard that requires police officers to take steps necessary to reasonably convey to drivers the advisements contained in the DR-15, as this interpretation is consistent with the purpose of the implied consent statute.

*2. Standard of Review.*

Typically, when reviewing a suppression ruling made during trial, the Court is limited to the evidence and arguments made at the hearing on the motion to suppress and not the trial record. *Lewis v. State*, 398 Md. 349, 358 (2007). The Court accepts the suppression court's factual findings and credibility determinations, unless clearly erroneous, viewing the evidence in the light most favorable to the prevailing party—here the State. *Bost v. State*, 406 Md. 341, 349 (2008); *State v. Tolbert*, 381 Md. 539, 548 (2004). The Court, of course, cannot review the evidence made at the hearing on the motion to suppress if the suppression court neither holds a suppression hearing nor hears any evidence. *See Goodwin v. Lumbermens Mut. Cas. Co.*, 199 Md. 121, 129–30 (1952) ("Obviously, then, if there is no factual statement or conclusion, there is no reason for the appellate court to examine the record with an evidentiary slant in favor of the appellee in order to sustain a non-existent presumption."). While we do not typically consider trial evidence when reviewing an appeal of the denial of a suppression motion, where (as here) there is no separate suppression hearing and the trial court holds a de facto suppression hearing during the trial, we can and should review the trial record to decide the suppression issue because the record is sufficiently developed.

We review de novo any legal questions. *Tolbert*, 381 Md. at 548. Here, the primary legal question is the proper standard by which advice of rights is reviewed.

*3. The Maryland Implied Consent and Advice of Rights Statute.*

Maryland, like all states, has adopted an implied consent statute: "[a]ny person who drives . . . a motor vehicle on a highway . . . is deemed to have consented . . . to take a test

16

if the person should be detained on suspicion of driving or attempting to drive while under the influence of alcohol."[7]   TR § 16-205.1(a)(2).   The purpose of Maryland's implied consent statute "is not to provide procedural protections to drivers who are suspected to be impaired by alcohol . . . instead, [its] purpose is to protect the public by deterring drunk and/or drugged driving." *Motor Vehicle Admin. v. Barrett*, 467 Md. 61, 70 (2020) (quoting *Motor Vehicle Admin. v. Seenath*, 448 Md. 145, 192 (2016)).   Still, for a breath test to be admissible, police officers must strictly adhere to the procedural requirements of the implied consent and advice of rights statute.  *See* CJ § 10-309(a)(l)(ii) ("Evidence of a test or analysis provided for in this subtitle is not admissible in prosecution for violation of [TR] § 16-113 or § 21-902 . . . if obtained contrary to the provisions of this subtitle."); *State v. Loscomb*, 291 Md. 424, 431, 437 (1981) ("[T]he results of the chemical test administered [are] inadmissible in prosecutions for violations of any law concerning a person accused of driving while intoxicated or impaired" when "there has been a failure to comply with the procedural requirements of  [TR] § 16-205.1").

Procedures include detaining the suspect, requesting that the suspect take a test, and, most importantly here, "advis[ing]" the suspect of the administrative sanctions and criminal penalties that accompany either refusing the test or a test reflecting a blood alcohol concentration above .08.  TR § 16-205.1(b)(2).   The advisements required of the implied consent statute are included in the Motor Vehicle Administration's ("MVA") DR-15 form.

---

[7] The statute defines a "test" as either a breath test or blood test.  TR § 16-205.1(a)(1)(iii).

17

This Court recently reaffirmed "that due process is satisfied when the motorist reads or is read the DR-15 because the DR-15 'accurately and adequately conveys to the driver the rights granted by the statute' and 'the consequences of a test refusal.'" *Barrett*, 467 Md. at 70 (quoting *Motor Vehicle Admin. v. Delawter*, 403 Md. 243, 262 (2008)). Indeed, the DR-15 form contains all the necessary advisements a driver needs to make an informed decision regarding the chemical breath test. *Id*. at 70–71.

The advisements are more than a formality, however. Compliance with the advice of rights requirement of TR § 16-205.1 is necessary to ensure that the driver has "a choice between two different potential sanctions, each affecting vitally important interests," *Sites v. State*, 300 Md. 702, 717 (1984), that is, automatic license suspension for refusal or potential criminal sanctions for submission.

While reading the DR-15 aloud or giving a copy of it to the driver to read may fully advise the driver of the sanctions for a test refusal, a driver may not be fully advised if the police officer confuses the driver about the sanctions. *Barrett*, 467 Md. at 71; *Hare v. Motor Vehicle Admin.*, 326 Md. 296, 304 (1992) ("[T]he State [must] not mislead the defendant or construct road blocks, thus unduly burdening that decision-making."). "A detained motorist is deprived of the opportunity to make a knowing and voluntary decision regarding whether to take the test if the motorist is not fully advised of the sanctions for a refusal." *Barrett*, 467 Md. at 71–72 (citing *Forman v. Motor Vehicle Admin.*, 332 Md. 201, 216–17 (1993)). We can think of few "road blocks" more detrimental to comprehension than a language barrier.

18

This is all to say that, although the primary purpose of the implied consent statute is to rid the State of the evils of drunk driving, there is a secondary purpose: to advise the driver of the potential sanctions for either submitting to or refusing a breath test. Readily apparent in the case law is that sufficient advice of rights is not a high burden on police officers. Indeed, simply reading the form is, in most cases, sufficient to avoid "road blocks." The case before us, however, is not "most cases." Reading the form in a language the driver does not understand is as good as not reading the form at all.

Most state implied consent statutes, like TR § 16-205.1(b)(2), have "notice," "inform," or "advise" requirements. *See* Flem K. Whited III, *Drinking/Driving Litigation: Criminal & Civil* § 11:15 (2d ed., West 2019). While no Maryland court has addressed whether TR § 16-205.1 advisements must be given in a language the driver understands, other jurisdictions have addressed similar contexts within similar statutory schema.[8] Like those courts, we analyze today the meaning of the word "advise" as it appears in the implied consent statute. We proceed to analyze those cases through the lens of Maryland's advisement requirement, that is, ensuring that the driver is fully advised and not impermissibly compelled to take a breath test. *Cf. Seenath*, 448 Md. at 186–87 ("[W]e

---

[8] We have addressed a similar question in the *Miranda* context. In *Gonzalez v. State*, the Court held that *Miranda* warnings provided in English to the defendant, a Mexican immigrant who did not speak or comprehend English, were constitutionally sufficient only when the officer "painstakingly—and, ultimately, successfully—conveyed to Petitioner in Spanish the balance of the *Miranda* warnings." 429 Md. 632, 653 (2012). Unlike the officers in this case, the officers in *Gonzalez* worked exhaustively to make sure the defendant understood what the officers were saying by spending twenty-two minutes translating and providing *Miranda* warnings in Spanish. *Id.* at 639–43.

must weigh the detained driver's interests—which include making informed decisions about whether to consent to take alcohol concentration tests and being able to earn a living by driving—against the State's interests, which include protecting the public, deterring drunk and/or drugged driving, and encouraging detained drivers to consent to take alcohol concentration tests."). We do so under the longstanding commitment of the General Assembly and Maryland judiciary to create a justice system accessible to all individuals regardless of their ability to understand English.[9]

---

[9] Mr. Portillo's brief provides several examples of the legislative and judicial commitment to an accessible justice system:

> Pursuant to §§ 1-202 and 3-103 of the Criminal Procedure Article [("CP")], a court "shall appoint a qualified interpreter to help a defendant . . . when the defendant . . . cannot readily understand or communicate the English language and cannot understand a charge made against the defendant or help present the defense." [CP] §§ 1-202(a)(1)(ii), 3-103(a)(1)(ii). Similarly, 9-114 of the Courts and Judicial Proceedings Article states that a court "shall appoint a qualified interpreter" to assist "a party, a witness, or a victim or victim's representative" who is "deaf or cannot readily understand or communicate the spoken English language." [CJ] § 9-114(a)(1)–(2). More generally speaking, Title 10, Subtitle 11 of the State Government Article contains provisions designed to implement "the policy of the State that State departments, agencies, and programs shall provide equal access to public services for individuals with limited English proficiency." Md. Code, State Gov't Art. § 10-1101[; s]ee also Md. Rule 5- 133(b)(2) (providing that, upon application, a court "shall appoint an interpreter free of charge in court proceedings"); *Biglari v. State*, 156 Md. App. 657, 665, *cert. denied*, 382 Md. 686 (2004) (explaining that "[t]he ability to understand the proceedings is essential to a defendant's right to a fair trial" and that "[i]f a criminal defendant is unable to speak and understand English, an interpreter must be provided to the defendant because a defendant who cannot understand what is being said is not fairly present at trial").

*4. The Applicable Standard.*

Of the other jurisdictions that have addressed the issue in this case, three general lines of authority have emerged. The first and most strict approach requires the police to accommodate non-English speakers by providing them with advisements of rights in languages they speak and understand. Mr. Portillo understandably urges the Court to adopt a similar standard. The second approach, a middle-of-the-road position, requires that police "reasonably convey" the advisements, which would entail giving them in a foreign language when practicable. The third and most flexible approach allows the police to provide advisements in English even to drivers who do not understand them.

The leading case on the strict approach is *State v. Marquez*, 998 A.2d 421 (N.J. 2010). The defendant in *Marquez*, who undisputedly did not understand English, challenged his conviction for refusing to take a breath test under New Jersey's implied consent law. Reversing, the New Jersey Supreme Court looked to the language of the statute, which, similar to TR § 16-205.l, required the police to "request" that drivers submit to a breath test and "inform" them of the consequences of refusal. *Id.* at 434. According to the court:

> the statute's obligation to "inform" calls for more than a rote recitation of English words to a non-English speaker. Knowledge cannot be imparted in that way. Such a practice would permit Kafkaesque encounters in which police read aloud a blizzard of words that everyone realizes is incapable of being understood because of a language barrier. That approach would also justify reading aloud the standard statement to a hearing-impaired driver who cannot read lips. We do not believe that the Legislature intended those absurd results. Rather, its directive that officers "inform," in the context of the implied consent and refusal statutes, means that *they must convey information in a language the person speaks or understands*.

21

*Id.* (emphasis added). The court highlighted that "reading the standard statement to motorists in a language they do not speak is akin to not reading the statement at all." *Id.* at 435. Thus, according to the court, "[t]he latter scenario renders a conviction defective. It makes no sense that English speakers will be acquitted if incomplete warnings are read to them in English, yet foreign-language speakers can be punished on the basis of empty warnings that fail to inform them." *Id.* (citations omitted).

The court was sure to caution that "it is not necessary for the State to prove that a driver actually understood the warnings on a subjective level." *Id.* at 438. "If properly informed in a language they speak or understand while sober, drivers can be convicted under the implied consent and refusal statutes. Voluntary, excessive drinking cannot and does not void the statutes. Indeed, that type of voluntary behavior is fundamentally distinct from a person's utter lack of ability to understand a foreign language." *Id.* Even under that court's new strict rule, therefore, "warnings given in English will presumably be competent." *Id.*

While *Marquez* is well reasoned under the New Jersey implied consent and criminal refusal law,[10] we think the better approach under the Maryland implied consent law is the

---

[10] This is a fairly significant factual distinction. In New Jersey, it is a criminal offense to refuse a blood alcohol content test, whereas in Maryland a refusal results in an administrative sanction. While *Marquez* is a refusal case—and this is a submission-to-the-test and admissibility case—both cases deal with the sufficiency of advisement. We do not ultimately adopt the *Marquez* standard, but we find portions of the *Marquez* analysis persuasive.

one employed by Wisconsin, Iowa, North Dakota, and most recently, New Hampshire.

Like the Supreme Court of New Hampshire

> we agree with the New Jersey Supreme Court [in *Marquez*] that "inform" means "to communicate knowledge to" and "make acquainted," [but] we do not agree that this definition creates an affirmative obligation on the officer to deeply probe into an arrested person's preferred language in order to convey the warnings in the language of preference. Such a requirement would shift the statutory focus from the "positive duty" imposed on the officer[] to the subjective understanding of the defendant. This approach would turn the statutory scheme on its head.

*State v. Mfataneza*, 210 A.3d 874, 878 (N.H. 2019) (internal citations and emphasis omitted) (quoting *Marquez*, 998 A.2d at 434). Instead, we will adopt a reasonableness standard which "furthers the legislature's intent and ensures that the goals of the statute will be realized." *Id.* at 879.

The Wisconsin Supreme Court in *State v. Piddington* was the first supreme court to espouse a reasonableness standard, i.e., that officers must use methods that reasonably convey the warnings and rights in the implied consent statute. 623 N.W.2d 528, 540 (Wis. 2001). In *Piddington*, the defendant, a deaf individual, argued for suppression of his blood alcohol content test because the police did not provide an American Sign Language ("ASL") interpreter. The officer providing the advice of rights, who was not certified in ASL but knew some sign language, communicated orally and by sign, and gave Mr. Piddington a written advisement form. Mr. Piddington read and initialed each paragraph on the form, indicating that he understood the advisements. The breath test resulted in several charges under Wisconsin's driving under the influence laws.

23

The trial court granted the motion to suppress the breath test, noting that "the attempts of law enforcement to communicate with the defendant were reasonable under all the circumstances, perhaps even exemplary" but that "those attempts were nonetheless insufficient to meet the State's burden to show that Piddington had been informed regarding his right to an alternative test and other information contained in the [written advisements] form." *Id.* at 536–37.

In reversing the suppression of the breath test, the Wisconsin Supreme Court looked to the intent of the Wisconsin implied consent law, which, like TR § 16-205.1, is twofold: "to combat drunk driving by facilitating the gathering of evidence against drunk drivers" and "to advise the accused about the nature of the driver's implied consent." *Id.* at 538 (cleaned up). Through that lens, the court concluded

> that whether law enforcement officers have complied with [the implied consent statute] turns on whether they have used reasonable methods which would reasonably convey the warnings and rights in [the statute]. As in *Miranda*-type cases, the State has the burden of proof of showing, by a preponderance of the evidence, that the methods used would reasonably convey the implied consent warnings. Also, in the implied consent setting, as well as in the *Miranda* setting, the onus is upon the law enforcement officer to reasonably convey the implied consent warnings.

*Id.* at 540 (citations omitted). Like the *Marquez* court, the Wisconsin Supreme Court noted both that the legal test was objective, "that is, whether the implied consent warnings were sufficiently administered must not depend upon the perception of the accused driver," and that each case depends on the particular circumstances at the time of the arrest. *Id.* at 539–40.

24

"The approach we adopt," the court explained, "only ensures that barriers which may affect the arresting officer's ability to reasonably convey the implied consent warnings to an accused driver, such as one with impaired hearing, are taken into account and accommodated as much as is reasonable under the circumstances." *Id.* at 542. The court therefore held that there was no error in the case before it as "the trooper performed a commendable job with his various attempts at accommodating and communicating with Piddington." *Id.* at 543.

At least three other state supreme courts have adopted a reasonableness rule similar to *Piddington*. *See Mfataneza*, 210 A.3d at 879 (adopting a reasonableness standard and finding that the officer did not "act[] unreasonably" where "there is evidence that the defendant: (1) knew the officer from prior encounters; (2) had spoken with the officer in English during these encounters; (3) told the officer twice at the police station that he spoke English; and (4) affirmatively indicated to the officer that he understood the statements on the form"); *State v. Ayala*, 894 N.W.2d 865, 868 (N.D. 2017) (adopting a reasonableness standard and holding that trial court had sufficient evidence to conclude the officer properly advised driver whose "English proficiency was limited but not so limited that he could not converse to some degree;" "the deputy repeated and rephrased portions of the advisory;" and the driver "responded to the officer's questioning and communicated with the officer"); *State v. Garcia*, 756 N.W.2d 216, 223 (Iowa 2008) (adopting "a reasonableness standard" and holding that the officer "used those methods which would reasonably convey the implied consent warnings" where there were numerous conversations between the officer

25

and the driver with little apparent difficulty in communicating and the driver did not indicate that he did not understand).[11]

We agree with those state supreme courts and adopt a reasonableness standard, as outlined below.

5. *Implications of the Reasonableness Standard.*

We are aware of several practical impacts as a result of our holding today.

Principally, as we have consistently held, reading the DR-15 in English to a driver who speaks English will almost always suffice. Cases where the driver does not speak English, however, require some other effort by police to inform the driver of the consequences of refusing to submit to a breath test.

The MVA acknowledges the challenge of serving the diverse language needs of Maryland drivers. It includes the implied consent law in a driver's manual that is available in English, Spanish, Traditional Chinese, Vietnamese, French, Korean, and Nepali.[12] It

---

[11] As indicated above, there is a third line of cases (which neither party relies on) that have taken the position that non-English advisements are *never* needed. Under Maryland's implied consent law, we find these cases unpersuasive. *See, e.g.*, *People v. Wegielnik*, 605 N.E.2d 487 (Ill. 1992) ("[W]e do not believe the purpose of the implied-consent statute is to advise drivers as to whether they should take blood-alcohol test, or to give them a choice between six- and three-month suspension," rather the sole objective of the law was to encourage drivers to take alcohol concentration tests, which is inconsistent with requirement that the police provide foreign language advisements); *see also State v. Tosar*, 350 S.E.2d 811, 813 (Ga. Ct. App. 1986); *State v. Mung*, 795 S.E.2d 284, 288 (N.C. Ct. App. 2016); *State v. Hurbean*, 261 N.E.2d 290, 298 (Ohio Ct. App. 1970); *State v. Cabanilla*, 273 P.3d 125, 132 (Or. 2012).

[12] *Maryland Drivers Manual*, Motor Vehicle Admin., https://mva.maryland.gov/Pages/Maryland-Drivers-Manual.aspx (last visited June 24, 2020), archived at https://perma.cc/72EK-P93X.

offers the driver license written exam in English, Spanish, Vietnamese, Korean, French, and Traditional Chinese.[13]  In addition, although oral tests are only given in English, the MVA allows applicants to use an interpreter.[14]

It is not unreasonable to expect Maryland police officers, like the MVA, to acknowledge and accept the challenge of serving drivers who speak other languages.  As Officer Sharkey admitted at trial, Montgomery County provides translators and telephonic translation services to officers.  The MVA also provides resources to law enforcement agencies for the enforcement of Maryland motor vehicle laws, including a Spanish audio reading of the DR-15 form.[15]  We think it prudent, like the New Jersey Attorney General in response to *Marquez*, that the executive branch takes further steps to accommodate non-English speaking Marylanders.  *See Marquez*, 998 A.2d at 437–38.  The MVA could, for example, (1) arrange for certified translated versions of the DR-15—in both written and audio form—in the foreign languages in which the MVA offers the written driver's test; (2) post translated written and audio files on its website, like it does in English and Spanish; and (3) send an advisory to all police departments to notify them of those developments.

---

[13]     *Driver Licensing, Knowledge Test*, Motor Vehicle Admin, https://mva.maryland.gov/drivers/Pages/rookie-driver-tutorial-intro.aspx (last visited June 24, 2020), archived at https://perma.cc/B8TF-PR7W.

[14] *Id.*

[15]     *Information for Law Enforcement*, Motor Vehicle Admin., https://mva.maryland.gov/Pages/police.aspx (last visited June 24, 2020), archived at https://perma.cc/7ZLV-5FWP.

We recognize that complications may arise even with the use of translated written documents and audio translations. For example, drivers may ask police officers follow-up questions that will go unanswered. But, as we have noted, "the Advice of Rights form need not inform a detained driver of every possible enticement for taking an alcohol concentration test and by analogy of every single possible permutation of the consequences of either failing or refusing to take an alcohol concentration test." *Seenath*, 448 Md. at 191. Again, sufficient advice of rights is a low hurdle, and is satisfied as long as the steps taken by the officer are reasonable under the circumstances.

We also recognize the time-sensitive nature of collecting blood and breath samples. With the large number of potential languages involved, it is not practical to expect that interpreters will always be available on short notice. "Precious time would be wasted in locating and transporting police officers or interpreters able to 'read' the standard statement in a particular language, and we do not construe the statute so narrowly as to require that approach." *Marquez*, 998 A.2d at 438 (citation omitted). Providing a translated copy of the DR-15 form, directing the driver's attention to the translated form, and playing an audio translation from the MVA website would be sufficient in most scenarios. Still, there exists the possibility of future cases involving less commonly spoken foreign languages which is precisely why we adopt a reasonableness standard and not the strict approach adopted in *Marquez.* The reasonableness standard strikes the right balance between deterring drunk driving and advising the driver of the consequences of taking or refusing a breath test.

The standard, therefore, must be an objective one. It is no defense for a driver to claim that they were too drunk to understand the advice of rights and it is not necessary for

the State to prove that the driver actually subjectively understood the warnings. To that end, warnings given in English are presumptively sufficient. Whether there is sufficient evidence to sustain a motion to suppress the breath test on sufficiency of advice grounds will depend on the facts of the particular case.

6. *Application and Disposition of This Case.*

While a court need not hear evidence on the admissibility of evidence outside the presence of the jury in all cases, such a procedure is often advisable and may be required in the interests of justice. Md. Rule 5-104(c). This is because, among other reasons, the evidence relevant to the determination might not be appropriate for the jury in advance of a decision on admissibility. For example, under Rule 5-104(d), a criminal defendant may testify with respect to a preliminary matter of admissibility and does not become, by virtue of giving that testimony, "subject to cross-examination as to other issues in the case."

When Mr. Portillo moved to suppress evidence of the breath test, he put before the trial court a preliminary question of admissibility that the court was obligated to determine, Md. Rule 5-104(a), and state its factual findings on the record. Md. Rule 4-252. The purpose of this requirement is to enable appellate review. *See Boyd v. State*, 399 Md. 457, 475 (2007); *see also Goodwin*, 199 Md. at 129–30 ("Obviously, then, if there is no factual statement or conclusion, there is no reason for the appellate court to examine the record with an evidentiary slant in favor of the appellee in order to sustain a non-existent presumption.").

The trial court erred in several respects. First, the court should have exercised its discretion to take evidence on Mr. Portillo's motions prior to trial and outside the presence

29

of the jury. Md. Rules 4-252(g)(1), 5-104(c); *see State v. Brown*, 324 Md. 532, 539 n.1 (1991) ("In this State, a hearing is customarily held in connection with the determination of any motion to suppress filed pursuant to Maryland Rule 4-252. Where a factual dispute is central to the resolution of the motion an evidentiary hearing is required.").

Further, it was not necessary for Mr. Portillo to request a separate pretrial hearing, as the trial court stated, regardless of whether the filed motion was styled a "Motion in Limine" or a "Motion to Suppress."[16] On an earlier occasion, the circuit court granted the State's motion to postpone and scheduled a hearing on Mr. Portillo's motions and his trial for July 22, 2019. The docket entries show that on June 25, 2019, the court granted the State's motion to postpone because a witness was unavailable and the court therefore "POSTPONE[D] [THE] CASE FOR A RULE 4-252 HEARING AND A ONE (1) DAY JURY TRIAL ON JULY 22, 2019 AT 8:30 A.M." Mr. Portillo should have been afforded all of the procedures required at a Rule 4-252 hearing.

Lastly, the trial court erred when it failed to make a finding, on the record, whether Officer Sharkey provided sufficient advice of rights by reading the DR-15 form to a driver with limited English proficiency. When defense counsel first renewed the motion to suppress during Officer Sharkey's testimony, the court declared that whether Mr. Portillo understood English "goes to weight, not the admissibility of it." Later, when it denied the motion, the court twice stated that it did not have any "evidence" that Mr. Portillo did not

---

[16] The State conceded at oral argument that the pre-trial hearing was a Rule 4-252 suppression hearing and that both motions in limine were essentially motions to suppress evidence that was allegedly obtained illegally.

understand English. The record, however, is replete with evidence that Mr. Portillo did not understand English, from Officer Sharkey's admission that he was concerned that Mr. Portillo only spoke Spanish to Mr. Portillo's repeated protests that his "language is Spanish" and his inability to answer basic questions and follow instructions.

Whether or not the police complied with TR § 16-205.1 and Mr. Portillo's right to due process by reading Mr. Portillo the advisements in English were preliminary questions of admissibility. To resolve the issues, and to enable appellate review, the court should have made an assessment, based on the evidence before it, whether Mr. Portillo understood English sufficiently to enable him to make a reasonably informed election.

To remedy these errors, we could order a limited remand. Although limited remands are relatively infrequent actions taken by this Court, our cases are "replete with examples where a limited remand is proper." *Montgomery Mut. Ins. Co. v. Chesson*, 399 Md. 314, 334 (2007); *see Southern v. State*, 371 Md. 93, 104–05 (2002) (collecting cases). A limited remand is proper where the purposes of "justice will be served by permitting further proceedings," *see* Md. Rule 8-604(d)(1), and the issue is discrete from the issue at trial, *Southern*, 371 Md. at 104–05, such as cases like this where the trial court failed to make findings of fact and effectively failed to rule on the suppression motion prior to trial. This is not the case of *Southern v. State*, where a party failed to meet the party's burden on issues raised in a completed suppression hearing—here, we would not be "reopen[ing] the suppression proceeding for the taking of additional evidence after [we] held the party has failed to meet its evidentiary burden." *Id.* at 105. Rather, the trial court here, despite holding a pretrial hearing, did not hear any evidence on the motion and did not make any

31

findings on the record. Once Mr. Portillo sought to suppress the breath test, it was the State's burden, as the proponent of the breath test evidence, to satisfy the court that Officer Sharkey complied with TR § 16-205.1. *See Loscomb v. State*, 45 Md. App. 598, 613 (1980), *aff'd*, 291 Md. 424 (1981). The court's determination that understanding the advisements "goes to the weight" and that Mr. Portillo could "argue at cross" do not satisfy the motions hearing requirement of Rule 4-252(g) that "[i]f factual issues are involved in determining the motion, the court shall state its findings on the record."

Although a limited remand would be a proper remedy, we do not think it is necessary to relitigate facts—that were sufficiently developed at trial—in a de novo suppression hearing. Instead, we hold that, based on the trial record before us, the State cannot meet the reasonableness standard adopted today. While we do not typically consider trial evidence when reviewing an appeal of the denial of a suppression motion, where (as here) there is no separate suppression hearing and the trial judge holds a de facto suppression hearing during the trial, we can and should review the trial record and decide the suppression issue because the record is sufficiently developed.[17]

There is substantial evidence that Mr. Portillo did not understand the DR-15 advisements. Further, despite the time-sensitive nature of blood alcohol testing, there is no

---

[17] In another case, where there is a motion to suppress breath test evidence, and the trial court (1) declines to hold a suppression hearing, and (2) in the trial, admits the breath test through the officer's testimony but refuses to allow cross-examination about the allegedly unreasonable nature of the advisements, a limited remand would be necessary and appropriate to conduct a suppression hearing to allow the trial judge to make a finding on reasonableness in the first instance. That is not this scenario.

legitimate concern that the investigation would have been delayed or hindered by providing Mr. Portillo with a Spanish version of the DR-15. It would have cost Officer Sharkey near-zero time to (1) indicate to Mr. Portillo that there was a Spanish translation on the back of the DR-15; (2) dial the language translator hotline; and/or (3) play the Spanish translation audio file from the MVA website. At no point in the advisement did Officer Sharkey indicate to Mr. Portillo that there was a Spanish translation on the back of the form. Further, Officer Sharkey never attempted to "read" the advisements in Spanish. While it is unclear whether Officer Sharkey or Mr. Portillo flipped over the DR-15 form to show the Spanish translation, it makes no difference whether Mr. Portillo actually read the DR-15 form because Officer Sharkey constructed a severe road block, unduly burdening Mr. Portillo's decision-making.[18] Officer Sharkey's actions were not objectively reasonable.

We reverse and remand for a new trial at which the breath test evidence must be suppressed. We next address the field sobriety test evidence.

## B. *Standardized Field Sobriety Tests.*

In his "Motion in Limine to Suppress Field Sobriety Tests," Mr. Portillo argued that (1) evidence related to his field sobriety tests was inadmissible because it was unduly prejudicial; (2) the evidence was not "rationally based on the witness' perception because the defendant only spoke Spanish and the tests were administered in English;" and (3) the

---

[18] Nor do we give any weight to the fact that Mr. Portillo actually signed the DR-15 form. Indeed, the way the form is currently structured, when a driver signs the DR-15 form certification, they are indicating that they were read the advisements in English and Spanish *in every case*, regardless of the language they speak.

33

administration of the field sobriety tests in English violated the Equal Protection Clause of the Fourteenth Amendment. The trial court denied the motion, concluding that "any issues concerning the individual's ability to understand are going to be issues . . . to explore on cross-examination." The court found "that there is a rational basis to permit the officer['s] testimony concerning his observations during the field sobriety tests are admissible." Mr. Portillo renews his contentions on appeal.

The State responds that (1) the trial court had broad discretion to admit the field sobriety evidence; (2) the court did not abuse that discretion; and (3) Mr. Portillo has not alleged an actionable Equal Protection claim. According to the State, the trial court properly denied Mr. Portillo's motions.[19] We agree.

---

[19] The State also argues that Mr. Portillo "affirmatively waived" his challenge to the field sobriety evidence by articulating to the court that he had "no objection" to Officer Sharkey's body camera footage showing the field sobriety tests. In general, "where a party makes a motion *in limine* to exclude irrelevant or otherwise inadmissible evidence, and that evidence is subsequently admitted, the party who made the motion ordinarily must object at the time the evidence is actually offered to preserve [its] objection for appellate review." *Brown v. State*, 373 Md. 234, 242 (2003) (quoting *Reed v. State*, 353 Md. 628, 637 (1999)). The procedural errors at the pre-trial hearing and trial, discussed in Part A.6 above, complicate this case. If we hold that Mr. Portillo waived his argument, we would be penalizing him for following the trial court's directions about how to litigate his motion after the court held an insufficient suppression hearing. When the court denied the motion prior to trial, it advised defense counsel that whether Mr. Portillo understood the field sobriety tests "goes to the weight. That, you can argue at cross"—which is exactly what Mr. Portillo did.

Technically, Mr. Portillo could have objected to the admission of the field sobriety test video evidence when it was offered at trial and still had an opportunity to attack the evidence on cross examination. However, we refuse to permit form over substance in this scenario—on several occasions during trial, defense counsel reminded the court that he was going to renew his motions in limine to suppress only to be rebuffed by the court. Defense counsel was not "sandbagging" and he gave "the trial court the opportunity to correct possible mistakes in its rulings." *Fisher v. State*, 367 Md. 218, 240 (2001).

34

*1. Standard of Review.*

An appellate court reviews de novo a trial court's determination as to whether evidence is relevant. *Ford v. State*, 462 Md. 3, 46 (2018). On the other hand, a ruling on the admission of evidence under Maryland Rules 5-403 and 5-701 is reviewed for abuse of discretion. *Id.*; *Robinson v. State*, 348 Md. 104, 118–19 (1997). In general, an appellate court reviews without deference a claim that a defendant's constitutional rights have been violated. *Stokes v. State*, 362 Md. 407, 414 (2001). The specific standard of review applicable to an Equal Protection challenge varies depending on the nature of the discrimination alleged. *See Trotman v. State*, 466 Md. 237, 256 n.8 (2019) (discussing difference between strict scrutiny, intermediate scrutiny, and rational basis tests).

*2. Admissibility of Field Sobriety Evidence.*

Generally, the admission of evidence is committed to the sound discretion of the trial court. *Kelly v. State*, 392 Md. 511, 530 (2006); *Merzbacher v. State*, 346 Md. 391, 404 (1997). Relevant evidence is generally admissible and evidence is relevant if it tends to prove or disprove a material fact in dispute. *See* Md. Rules 5-401, 5-402. Courts may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice or other countervailing concerns. *See* Md. Rule 5-403. Once a relevancy determination is made, courts "are generally loath to reverse a trial court unless the evidence is plainly inadmissible under a specific rule or principle of law or there is a clear showing of an abuse of discretion." *Merzbacher*, 346 Md. at 404–05. This Court therefore will not reverse a trial court's decision to admit relevant evidence over an objection that the evidence is unfairly prejudicial absent an abuse of discretion.

As a practical matter, we agree with Mr. Portillo that adequate performance on field sobriety tests requires a basic understanding of the tests. A person with limited English proficiency is likely going to struggle understanding the parameters of the tests even if, as here, the tests are physically demonstrated by the officer. As an evidentiary matter, however, unlike a breath test, field sobriety tests are not "protected" by advice of rights requirements.

We disagree with Mr. Portillo that the field sobriety evidence was not relevant—in a drunk driving case, any evidence that tends to prove that the driver was impaired by alcohol is relevant to the case and probative of that fact. We also disagree with the crux of Mr. Portillo's argument that the field sobriety evidence contained unhelpful lay opinion testimony under Rule 5-701 and was unduly prejudicial under Rule 5-403 because Officer Sharkey instructed Mr. Portillo in English rather than Spanish.

Opinion testimony by a lay witness is proper when those opinions "are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Md. Rule 5-701. Officer Sharkey's testimony was helpful lay testimony.[20] He testified to his firsthand observations

---

[20] Mr. Portillo does not argue that Officer Sharkey did not qualify as an expert witness, despite our holding in *State v. Blackwell* that an officer's "testimony about [the driver's] performance on the HGN test constituted expert testimony subject to the strictures of Md. Rule 5-702." 408 Md. 677, 691 (2009). At trial, the parties agreed that "no expert opinion was given." On the HGN test, the court instructed the jury that "You have heard evidence concerning the results of the horizontal gaze nystagmus test. As with any other evidence, it is for you to decide how much weight to give this evidence. In deciding what weight is to be given the evidence, you should consider the training and experience of the technician, the equipment that was used and the procedures that were followed."

at the scene. The testimony was helpful because it showed the jury why the officers arrested Mr. Portillo. Without the testimony, there would have been little factual explanation (1) of how Officer Sharkey came upon Mr. Portillo and (2) of why the officers arrested Mr. Portillo. As with any other evidence, it is for the jury to decide the weight of that evidence.

Further, the evidence was not unduly prejudicial under Rule 5-403. A driver's confusion or inability to follow instructions is circumstantial evidence of that driver's impairment. *Cf. Ford*, 462 Md. at 47 ("[I]f relevant, circumstantial evidence regarding a defendant's conduct may be admissible under M[aryland] Rule 5-403 . . . .") (quoting *Decker v. State*, 408 Md. 631, 640 (2009)). Like most circumstantial evidence, there might be innocent explanations for the evidence. That does not mean that the evidence is unduly prejudicial under Rule 5-403. *Id.* at 50 ("Simply because there is a possibility that there exists some innocent, or alternate, explanation for the conduct does not mean that the proffered evidence is *per se* inadmissible." (quoting *Thomas v. State*, 297 Md. 557, 578 (2007)). Mr. Portillo had—and took—the opportunity at trial to offer the innocent explanation that he did not understand the field sobriety test instructions. The trial court did not abuse its discretion by allowing the State to introduce video footage and Officer Sharkey's testimony regarding the field sobriety tests.

*3. Equal Protection Claim.*

Mr. Portillo claims that he was entitled to suppression of the field sobriety test evidence under the Equal Protection Clause of the Fourteenth Amendment. He argues that

37

by administering the field sobriety test in English, Officer Sharkey discriminated against him because he has limited English proficiency.

We, of course, agree with the general proposition that discrimination based on national origin or proficiency in a particular language may violate the Fourteenth Amendment. We do not agree, however, that the proper remedy for such violations is necessarily suppression of evidence otherwise lawfully obtained. Mr. Portillo has not stated, and we have not found, any Maryland or Supreme Court authority recognizing an exclusionary remedy in a criminal case for violations of the Equal Protection Clause. *See Ford v. State*, 184 Md. App. 535, 571 (2009) ("Maryland does not have an independent exclusionary rule."); *United States v. Nichols*, 512 F.3d 789, 794 (6th Cir. 2008) (while "checking individuals for outstanding warrants in an intentionally racially discriminatory manner may violate the Equal Protection Clause . . . we are aware of no court[21] that has

---

[21] The Massachusetts and New Jersey high courts have expanded the exclusionary rule to permit suppression in certain Equal Protection related cases. *See Commonwealth v. Lora*, 886 N.E.2d 688 (Mass. 2008); *State v. Segars*, 799 A.2d 541 (N.J. 2002). Several commenters have advocated for an expansion, especially in the context of pretextual stops. *See, e.g.*, Albert W. Alschuler, *Racial Profiling and the Constitution*, 2002 U. Chi. Legal F. 163, 254; Brooks Holland, *Racial Profiling and a Punitive Exclusionary Rule*, 20 Temp. Pol. & Civ. Rts. L. Rev. 29 (2010); Brooks Holland, *Safeguarding Equal Protection Rights: The Search for an Exclusionary Rule Under the Equal Protection Clause*, 37 Am. Crim. L. Rev. 1107, 1110 (2000); Lawrence W. Williamson, Note, *Profiling, Pretext, and Equal Protection: Protecting Citizens From Pretextual Stops Through the Fourteenth Amendment*, 42 Washburn L.J. 657 (2003).

38

ever applied the exclusionary rule for a violation of [that] Clause"). We decline Mr. Portillo's invitation to craft such a remedy at this time.

In sum, the trial court did not abuse its discretion in admitting the field sobriety evidence. That evidence will be admissible on re-trial, should the State choose to present it.

## CONCLUSION

Sufficient advice of rights in a drunk driving case is a low hurdle, but we refuse to reduce that hurdle to a line on the pavement. Justice is not served if required advice of rights is debased to a formality satisfied by reading the advice in English to a non-English speaking driver. We hold that officers must use methods that reasonably convey the warnings and rights in the implied consent statute. This is an objective standard and does not depend on the subjective understanding of the driver. A driver's inability to understand English and consequent inability to comprehend the advice of rights is a factual issue when presented in a motion to suppress. Likewise, whether the actions of the officer reasonably conveyed the warnings and rights in the implied consent statute is an issue of fact to be determined by the suppression court. Officer Sharkey's actions were not reasonable. We therefore reverse and remand for a new trial at which the breath test evidence must be suppressed.

> **JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT TO BE PAID BY RESPONDENT.**

39

# APPENDIX

# ADVICE OF RIGHTS – (Maryland Transportation Article §16-205.1)

You have been stopped or detained and reasonable grounds exist to believe that you have been driving or attempting to drive a motor vehicle under circumstances requiring that you be asked to submit to a test under Maryland Transportation Article §16-205.1. In this situation, the law deems that you have consented to take a test to measure the alcohol concentration or drug or controlled dangerous substance content in your system. You may refuse to submit to the test(s), unless you were in a motor vehicle accident resulting in the death of or life-threatening injury to another person.

**Suspension of Your Maryland Driver's License or Driving Privilege:**
If you refuse to submit to the test, or if you submit to the test and the result indicates an alcohol concentration of 0.08 or more at the time of testing, your Maryland driver's license shall be confiscated, you will be issued an Order of Suspension and, if eligible, a temporary license valid for 45 days. The following periods of suspension shall be imposed against your license or privilege to drive in Maryland:

**If you refuse to submit to a test, your suspension shall be 270 days for a 1st offense and 2 years for a 2nd or subsequent offense.**

**If your test result is an alcohol concentration of at least 0.08 but less than 0.15, your suspension shall be 180 days. If the offense involves a motor vehicle accident that resulted in the death of another person, your suspension shall be 6 months for a 1st offense and 1 year for a 2nd or subsequent offense.**

**If your test result is an alcohol concentration of 0.08 but less than 0.15, your suspension may be modified or a restricted license may be issued at a hearing.**

**If your test result is an alcohol concentration of 0.15 or more, your suspension shall be 180 days for a 1st offense and 270 days for a 2nd or subsequent offense. If the offense involves a motor vehicle accident that resulted in the death of another person, your suspension shall be 1 year for a 1st offense and for a 2nd or subsequent offense your license shall be revoked.**

**If you refuse a test, or take a test with a result of 0.15 or more, you shall be ineligible for modification of your suspension or the issuance of a restricted license, unless you participate in the Ignition Interlock System Program under Maryland Transportation Article §16-404.1.**

**If you hold a commercial driver's license (CDL)** and were driving a non-commercial motor vehicle when you were stopped, and you refuse to submit to a test, your CDL or privilege shall be disqualified for 1 year for a 1st offense or for life if your CDL or privilege has been previously disqualified for at least 1 year under Maryland Transportation Article §16-812 (a) or (b), a federal law, or any other state's law.

**If you were operating a commercial motor vehicle** and your test result indicates an alcohol concentration of 0.04 or more, or if you refuse to submit to a test, your commercial driver's license or privilege shall be disqualified for a period of 1 year for a 1st offense, 3 years for a 1st offense committed while transporting hazardous materials required to be placarded, and disqualified for life if your commercial driver's license has been previously disqualified for at least 1 year and/or you have incurred 2 offenses of Maryland Transportation Article §16-812 (a) or (b), a federal law, or any substantially similar offense(s) under any other state's law.

**If you are convicted of a drunk or drugged driving offense under Maryland Transportation Article §21-902**, and the judge or jury finds beyond a reasonable doubt that you knowingly refused to take a test of breath arising out of the same circumstances, an additional criminal penalty of more than $500 or imprisonment for not more than 2 months, or both, may be imposed under Maryland Transportation Article §27-101 (x).

**If you are convicted of a drunk or drugged driving offense under Maryland Transportation Article §21-902 (b) or (c)**, and the judge or jury finds beyond a reasonable doubt that you knowingly refused to take a test of breath arising out of the same circumstances, the Court shall require you, under Maryland Transportation Article §27-107.1, to participate in the Ignition Interlock System Program for 1 year pursuant to Maryland Transportation Article §16-404.1.

**You may request an Administrative Hearing** at any time within 30 days of the date of the Order of Suspension to show cause why your driver's license or privilege should not be suspended. You must request a hearing within 10 days of the date of the Order of Suspension to ensure that your privilege to drive is not suspended prior to your hearing. Your request for a hearing must be made in writing. You may use the "Hearing Request" form if available. Send your request to the Office of Administrative Hearings at 11101 Gilroy Rd., Hunt Valley, MD 21031-1301. You must include a check or money order for $150.00, which is the required filing fee, made payable to the "Maryland State Treasurer." Your request for a hearing will be invalid if submitted without the required $150.00 filing fee or applicable fee waiver.

**Your driver's license or privilege will be suspended on the 46th day after the Order of Suspension** if you do not request a hearing within 10 days of the date of the Order of Suspension or, if eligible, you do not elect within 30 days of the Order of Suspension to participate in the Ignition Interlock System Program. In order to receive credit for the suspension, you must surrender your driver's license or certify that you no longer have the license in your possession. If you submit a valid hearing request, a suspension will not be imposed unless a decision is rendered against you, or if you fail to appear for the hearing.

**Instead of requesting a hearing or upon the suspension or revocation of your driver's license, you may elect to participate in the Ignition Interlock System Program** if the following conditions are met: 1) your driver's license is not currently suspended, revoked, canceled, or refused; and 2) within 30 days of the date of this Order of Suspension you a) elect in writing to participate in the Ignition Interlock System Program for 1 year if your test resulted in an alcohol concentration of 0.15 or more or you refused the test or 6 months if your test resulted in an alcohol concentration of at least 0.08 but less than 0.15; and b) surrender a valid Maryland driver's license or sign a statement certifying that the license is no longer in your possession. An Ignition Interlock Election form is located on the reverse side of the driver's copy of the Order of Suspension.

**Certification: I, the Undersigned Police Officer,** certify under the penalties of perjury, that I have advised the driver of the above stated rights and sanctions and have provided the driver with the aforementioned advice in: English and Spanish.

*Certificación: Yo, el oficial de policía abajo firmante, certifico bajo pena de perjurio que he aconsejado al conductor acerca de sus derechos y sanciones arriba mencionados, y que le he proporcionado la notificación arriba mencionada al conductor en: inglés y español.*

**Signature of Officer**_____ **I.D. No.** _____ **Police Agency** _____
*Firma del Oficial*        *N.º de Identificación*        *I.E Agencia de Policía*

**Read before Signing: I, the undersigned driver**, acknowledge that I have been read or I have read the above stated Advice of Rights as certified by the police officer. I understand that this requested test is in addition to any preliminary tests that were taken.

*Leer Antes de Firmar: Yo, el conductor abajo firmante, reconozco que me han leído o he leído la Notificación de Derechos arriba mencionada según lo certifica el oficial de policía. Comprendo que esta prueba solicitada es adicional a cualquier prueba preliminar que se haya realizado.*

**Having been so advised, do you now agree to submit to a test? (Officer check driver's reply)**

*Habiendo sido de este modo notificado, está Usted de acuerdo ahora en someterse a la prueba? (Oficial, revise la respuesta del conductor)*

❑ **Yes - Agree to submit to an alcohol concentration test**
*Sí – Acepta someterse a una prueba de concentración de alcohol en la sangre*

❑ **Yes - Agree to submit to a test for drug or controlled dangerous substance (CDS)**
*Sí – Acepta someterse a una prueba de drogas o sustancias peligrosas controladas (CDS)*

❑ **No - Alcohol concentration test, refused**
*No – La prueba de concentración de alcohol en la sangre ha sido rechazada*

❑ **No - Drug or CDS test refused (DRE must complete & submit DRE Certification Form)**
*No – La prueba de drogas o CDS ha sido rechazada*

**Signature of Driver** _____ **Date** _____ **Time** _____ **DR-015A Control #** _____
*Firma del conductor*        *Fecha*        *Hora*

# NOTIFICACIÓN DE DERECHOS - (Artículo de Transporte de Maryland, Sección 16-205.1)

A Usted lo han parado o detenido y existen motivos razonables para creer que estaba conduciendo o intentaba conducir un vehículo motorizado bajo circunstancias que requieren que se le solicite que se someta a una prueba según la Sección 16205.1 del Artículo de Transporte de Maryland. En esta situación, la ley considera que Usted ha consentido tomar una prueba para medir la concentración de alcohol o drogas o el contenido de sustancias controladas peligrosas en su cuerpo. Usted puede rehusar tomar las pruebas, a menos que Usted estuviese en un accidente de tráfico que haya resultado en la muerte o en una lesión que amenace la vida de otra persona.

**Suspensión de su Licencia de Conducir de Maryland o Privilegio de Conducir:**

Si Usted rehusa someterse a la prueba, o se realiza la prueba y el resultado indica una concentración de alcohol de 0.08 o más en el momento de la prueba, su licencia de conducir de Maryland será confiscada, se le expedirá una Orden de Suspensión y, si es elegible, una licencia temporal válida por 45 días. Se impondrán los siguientes períodos de suspensión en contra de su licencia o del privilegio de conducir en Maryland:

**Si Usted rehusa someterse a una prueba, su suspensión será de 270 días por una primera infracción y de 2 años por una segunda y subsiguiente infracción.**

**Si su prueba resulta es una concentración de alcohol de por lo menos 0.08 pero inferior a 0.15, la suspensión será de 180 días. Si la infracción involucra un accidente automovilístico que resultó en la muerte de otra persona la suspensión será de 6 meses por la primera infracción y de 1 año por una segunda o subsiguiente infracción.**

**Si el resultado de la prueba es una concentración de alcohol de por lo menos 0.08 pero inferior a 0.15, su suspensión puede ser modificada o se le puede expedir una licencia restrictiva en una audiencia.**

**Si el resultado de la prueba es una concentración de alcohol de 0.15 o más, la suspensión será de 180 días por una primera infracción y 270 días por una segunda o subsiguiente infracción. Si la infracción involucra un accidente de tráfico que resultó en la muerte de otra persona la suspensión será de 1 año por la primera infracción y por una segunda o subsiguiente infracción su licencia será revocada.**

**Si Usted rehusa tomar una prueba o toma la prueba con un resultado de 0.15 o más, no será elegible para que le modifiquen su suspensión o para que le expidan una licencia restrictiva, a menos que participe en el Programa del Sistema Interruptor de Encendido (Ignition Interlock System Program) conforme a la Sección 16-404.1 del Artículo de Transporte de Maryland.**

Si Usted posee una licencia para conducir vehículos comerciales (CDL, en sus siglas en inglés) y estaba conduciendo un vehículo motorizado no comercial cuando lo pararon, y rehusa someterse a una prueba, su CDL o el privilegio de conducir será descalificado por 1 año por una primera infracción o de por vida si su CDL o el privilegio ha sido descalificado anteriormente al menos por 1 año bajo la Sección 16-812 (a) o (b) del Artículo del Transporte de Maryland, una ley federal, o cualquier otra ley estatal.

Si Usted estaba conduciendo un vehículo motorizado comercial y el resultado de la prueba indica una concentración de alcohol de 0.04 o más, o si Usted rehusa someterse a la prueba, su licencia comercial de conducir o privilegio de conducir será descalificado por el período de 1 año por la primera infracción, por 3 años por la primera infracción cometida al transportar materiales peligrosos que deben rotularse, y se descalificaran de por vida si su licencia comercial de conducir ha sido descalificada previamente al menos por 1 año y/o cometió 2 infracciones conforme a la Sección 16-812(a) o (b) del Artículo de Transporte de Maryland, una ley federal, o cualesquier otra(s) infracción(es) sustancialmente similar(es) bajo cualquier otra ley estatal.

Si se le condena por la infracción de conducir ebrio o drogado bajo la Sección §21-902 del Artículo de Transporte de Maryland, y el juez o jurado considera, más allá de toda duda razonable, que Usted se negó a sabiendas a tomar una prueba de aliento que resulta de las mismas circunstancias, se le puede imponer una sanción penal adicional de no más de $500 o encarcelamiento por no más de 2 meses, o ambas sanciones, bajo la Sección 21-902 (x) del Artículo de Transporte de Maryland.

Si se le declara culpable por el delito de conducir embriagado o drogado bajo la Sección 21-902 (b) o (c), y el juez o el jurado concluye más allá de toda duda razonable que Usted a sabiendas se negó a tomar una prueba de aliento que resulta de las mismas circunstancias. el Tribunal podrá requerir, bajo la Sección 27-107.1 del Artículo de Transporte de Maryland, que participe en el Programa del Sistema Interruptor de Encendido (Ignition Interlock System Program) durante 1 año conforme a la Sección 16-404.1 del Artículo de Transporte de Maryland.

Usted puede solicitar una Audiencia Administrativa en cualquier momento en un plazo de 30 días a partir de la fecha de la Orden de Suspensión para aducir con buenos argumentos por qué su licencia de conducir o el privilegio de conducir no deben ser suspendidos. Usted debe solicitar una audiencia dentro del plazo de 10 días a partir de la fecha de la Orden de Suspensión para asegurar que su privilegio de conducir no se suspenda antes de su audiencia. Su solicitud para obtener una audiencia debe hacerse por escrito. Usted puede usar el formulario titulado "Solicitud de Audiencia", si está disponible. Envíe su solicitud a la Oficina de Audiencias Administrativas: Office of Administrative Hearings, 11101 Gilroy Rd., Hunt Valley, MD 21031-1301. Debe incluir un cheque o giro postal por $150.00, que es la tarifa requerida, pagadero al "Maryland State Treasurer". Su petición de audiencia no será válida si se envía sin el pago requerido de $150.00 o sin la exención de la tasa aplicable.

Su Licencia o Privilegio de Conducir serán suspendidos a los 46 días posteriores de la Orden de Suspensión si Usted no solicita una audiencia dentro 10 días a partir de la fecha de la Orden de Suspensión o, si es elegible, Usted no elige participar dentro de los 30 días a partir de la fecha de la Orden de Suspensión en el Programa del Sistema Interruptor de Encendido (Ignition Interlock System Program). Para recibir crédito por la suspensión, debe entregar su licencia de manejo o certificar que ya no tiene la licencia en su posesión. Si Usted presenta una solicitud de audiencia válida, no se impondrá una suspensión a menos que se tome una decisión en su contra, o si Usted no comparece a la audiencia.

En lugar de solicitar una audiencia, o tras la suspensión o revocación de su licencia de manejo, Usted puede elegir participar en el Programa del Sistema Interruptor de Encendido (Ignition Interlock System Program) si se cumplen las condiciones siguientes: 1) su licencia de conducir no está actualmente suspendida, revocada, cancelada, o denegada; 2) en un plazo de 30 días a partir de la fecha de esta Orden de la Suspensión Usted a) elige por escrito participar en el Programa del Sistema Interruptor de Encendido (Ignition Interlock System Program) por 1 año, si su prueba resultó en una concentración de alcohol de 0.15 o más, o si se negó a hacerse la prueba; o por 6 meses, si su prueba resultó en una concentración de alcohol de 0.08 pero menos de 0.15; y b) entrega su licencia de conducir de Maryland válida o firma una declaración certificando que la licencia ya no está en su posesión. En el reverso de la copia del conductor de la Orden de Suspensión se encuentra un formulario para seleccionar el Programa del Sistema Interruptor de Encendido (Ignition Interlock System Program).