*State of Maryland, et al. v. Michael Young*, Case No. 1885, Sept. Term 2023, Opinion filed on March 27, 2025, by Berger, J.

UNCONSTITUTIONAL PATTERN OR PRACTICE CLAIM – VIABILITY AGAINST THE STATE

An individual may bring a "pattern or practice" claim against a local government and its employees alleging that the local government maintained an unconstitutional pattern or practice that harmed the individual under *Prince George's County v. Longtin*, 419 Md. 450 (2011). The Maryland State government is similarly answerable for the misconduct of its employees and may not cause such conduct through unconstitutional patterns or practices. As such, *Longtin* applies to the State for any constitutional deprivations that are caused by either its own actions or that of its employees.

TORT – NEGLIGENCE – FORSEEABILITY OF HARM

Correctional officers have a duty to protect inmates from harm that is reasonable or foreseeable under the circumstances. It was not "speculation, hypothesis, [or] conjecture" for a jury to determine that a supervising officer should have reasonably foreseen that when there was a group of inmates standing outside of an individual's cell, opening the cell door could result in harm to the individual inside. It was similarly reasonable for a jury to find that a warden was negligent in failing to properly investigate after an individual expressed in a letter that he feared for his life after being previously attacked.

THE MARYLAND TORT CLAIMS ACT – DAMAGES LIMIT – SINGLE INCIDENT OR OCCURRENCE

The Maryland Tort Claims Act ("MTCA") waives immunity for the State and provides that "[t]he liability of the State and its units may not exceed $400,000 to a single claimant for injuries arising from a single incident or occurrence." Where, following officer negligence, an inmate was attacked in his cell by one group of inmates with weapons, the attack ceased, the individual escaped, and the individual was attacked by a second group of inmates in a second location without weapons, the individual has experienced two distinct "incidents or occurrences" and is entitled to recover $400,000 for each incident or occurrence.

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1885

September Term, 2023

_____

STATE OF MARYLAND, ET AL.

v.

MICHAEL YOUNG

_____

Berger,
Nazarian,
Ripken,

JJ.

_____

Opinion by Berger, J.

_____

Filed: March 27, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This case arose after Michael Young ("Young"), appellee, was attacked at the Maryland Correctional Training Center ("MCTC") on December 25, 2017. On December 23, 2020, Young filed suit in the Circuit Court for Baltimore County against the State of Maryland, the Maryland Department of Public Safety and Correctional Services ("DPSCS"), Sergeant Jeremy Wright, and MCTC Warden Richard Dovey. Young asserted both constitutional claims and common law negligence claims against the individuals. In addition, Young brought an unconstitutional pattern or practice claim against the State under *Prince George's County v. Longtin*, 419 Md. 450 (2011), asserting that the State had engaged in a pattern or practice of failing to protect incarcerated individuals from harm by other inmates and officers.

The jury found Sergeant Wright and Warden Dovey negligent and awarded Young $1,000,000 in damages against each of them. Nevertheless, the jury found that neither individual had violated Young's constitutional rights. In addition, the jury found the State liable under *Longtin* for maintaining an unconstitutional pattern or practice by failing to protect incarcerated individuals and awarded $2,000,000 against the State. The State filed post-trial motions for a new trial, for judgment notwithstanding the verdict, and, alternatively, for reduction of the judgment against the State. Young filed a motion in opposition and conceded that the awards in favor of Young against Sergeant Wright and Warden Dovey should be reduced to $800,000 pursuant to the statutory cap allowed under the Maryland Tort Claims Act ("MTCA"). The State's post-trial motions were denied, and the State timely appealed.

**QUESTIONS PRESENTED**

The State presents three questions for our review, which we have recast and rephrased as follows:[1]

I.     Whether the trial court erred in declining to grant a new trial or judgment notwithstanding the verdict regarding the *Longtin* pattern or practice claim against the State.

II.    Whether the trial court erred in declining to grant judgment notwithstanding the verdict regarding the negligence judgments against Sergeant Wright and Warden Dovey.

III.    Whether the trial court erred in denying the State's motion to reduce the judgment against the State when the statutory cap allowed under the MTCA is $400,000 per incident.

---

[1] The State phrased the questions as follows:

1. Should the *Longtin* judgment against the State be reversed or vacated, where the Supreme Court of Maryland has upheld pattern-or-practice liability only against local governments; the jury's verdict rested on testimony regarding previous settlements, mere allegations, and factually irrelevant verdicts introduced through a process not authorized by the Maryland Rules; and the jury separately found that neither individual defendant had violated Mr. Young's constitutional rights?

2. Should the negligence judgments against the individual defendants be reversed or vacated, where there was no evidence that Mr. Young was at a risk of foreseeable harm and no expert testimony concerning any standard of care that might have applied?

3. If the judgments are not otherwise reversed or vacated in their entirety, should they be replaced by a single judgment of $400,000 against the State, where the jury found that neither individual defendant had acted with malice or gross negligence and the Maryland Tort Claims Act ("MTCA") limits the State's liability to $400,000 for a single incident or occurrence?

2

As we will discuss below, we hold that while a *Longtin* claim may be brought against the State, the trial court erred in declining to grant the State's motion for judgment notwithstanding the verdict on the *Longtin* claim because, in this instance, Young did not present sufficient evidence to support a finding of a pattern or practice of unconstitutional conduct by the State.

Further, we hold that the trial court did not err in declining to grant judgment notwithstanding the verdict regarding the jury's finding of negligence against Sergeant Wright and Warden Dovey. Finally, because the attacks on Young did not constitute one incident or occurrence, the appropriate cap on damages to be awarded to Young is $800,000.

We, therefore, reverse the judgment against the State on the *Longtin* claim, and we affirm the judgments as to the negligence claims against Sergeant Wright and Warden Dovey. As the State correctly observes in its brief, Sergeant Wright and Warden Dovey enjoy immunity from tort liability "for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence, and for which the State or its units have waived immunity." Md. Code, Courts and Judicial Proceedings Article § 5-522(b) (1973, 2020 Repl. Vol.). The jury awarded Young $1,000,000 against each individual, and Young's award is capped under the MTCA. Accordingly, we remand to the circuit court to enter judgment in the amount of $800,000 in favor of Young, which is enforceable against the State.

## BACKGROUND

### Prior to the Attacks

At the time of his attacks in December 2017, Young was an inmate at MCTC, a medium security prison. He had previously been detained at MCTC and was transferred to the Maryland Correction Institute-Hagerstown ("MCIH") after complaining of sexual harassment by a correctional officer. In February 2017, Young returned to MCTC. Shortly thereafter, on February 14, 2017, Young was attacked by his cellmate, who allegedly said that "the [correctional officer] told him to do it because of what happened at MCIH." Following this instance, Young was placed in administrative segregation. During this time, Young wrote a letter to Warden Dovey regarding Young's concern for his "safety, health and wellbeing," and described the February 14 attack. In the letter, Young alleged that he had filed ARP[2] complaints in the past, particularly one in which Young expressed "fearing for [his] safety," and never heard back. Young claimed that because his ARPs had been ignored, he wrote the letter to Warden Dovey and presented it to his wife to deliver. The letter was received by Warden Dovey in March 2017.

At trial, Warden Dovey testified that "any time anyone . . . says they fear for their safety, there's going to be an investigation by someone." Warden Dovey acknowledged

---

[2] An ARP refers to DPSCS's administrative remedy procedure. COMAR 12.02.28.00 – 12.02.28.9999. The ARP process is the formal process to "address inmate complaints concerning conditions of confinement." COMAR 12.02.28.02.B.1. After an inmate files a complaint, the unit head or shift commander receiving the complaint form shall provide the inmate with a receipt form. COMAR 12.02.28.08.E.2. The complaint shall be reviewed, and if appropriate, investigated and resolved within fifteen days. COMAR 12.02.28.08.E.3.

that it was his responsibility as warden to ensure that such investigations took place. Warden Dovey testified that although Young's allegations were assigned to an officer to investigate, he did not receive a report of the investigation. Finally, Warden Dovey agreed that if Young's complaints were investigated and it was found that he had valid fears for his life, he could have been placed in administrative segregation for his safety. Young testified that he was never contacted to discuss the letter or investigate the February 14 attack further. Young was returned to general population following the administrative segregation that resulted from the attack by his cellmate in February 2017. Young did not file any additional ARPs or reach out to the warden's office again. He remained in general population until the attacks that have given rise to the present appeal.

### *The Attacks on Young on December 25, 2017*

On December 25, 2017, Young resided in a general population tier at MCTC in a single-occupant cell. A tier officer is assigned to observe the tier from the control panel box behind a locked grille, and to periodically make rounds and observe the inmates in their cells. From the control panel box, the tier officer is able to remotely open and close the doors on each cell, either individually or all at once. Accordingly, the tier officer has a "pretty good line of sight" to see down the hallways outside of the cells in order to observe any movement on the tier. Lieutenant Johnavin McKinley, another corrections officer at MCTC, testified that "you can see everything from the panel box," including any activity on the tier. Inmates are locked in their cells at all times, and are only released for specifically designated activities, such as recreational time. During recreational time, the tier officer would open all of the cell doors remotely, allowing the inmates to exit their

5

cells and proceed to the recreation hall. After the inmates leave their cells, the cell doors are closed and locked. Individuals may choose to remain inside of their cells instead of going to the recreation hall. The cell doors remain locked, although the recreation hall door is unlocked, and individuals may return to their cells early if they desire. The only individual with the ability to lock and unlock the cell doors is the tier officer.

Sergeant Wright was the tier officer on duty on December 25, 2017. At approximately 12:30 p.m., Sergeant Wright opened all of the cell doors for the inmates to proceed to the recreation hall. Young opted to remain in his cell. After the inmates proceeded to the recreation hall, Sergeant Wright closed and locked all of the cell doors. Young testified that while in his cell, he heard Sergeant Wright yell "everybody off the tier," and shortly thereafter, Young's cell door opened, and a group of men rushed in with weapons. Jamel Ramsey, an inmate located across the hallway from Young, testified that he saw "four or five guys on the outside of [Young's] cell" who then proceeded to enter the cell. Young was struck in the face with a combination lock inside of a sock, held down on his bed, and stabbed in the head, back, side, and arm a total of seventeen times. Thereafter, Young was able to escape the cell and enter the tier.

Young began to walk towards the recreation hall, at which point he passed Sergeant Wright in the control panel box. Sergeant Wright testified that he immediately called for assistance when he saw Young, but did not physically intervene and remained in the control panel box. Young was then grabbed by a separate group of individuals, pulled into the bathroom area of the recreation hall, and beaten again until additional officers arrived. The

6

second group of individuals did not use weapons. Young was transported to the hospital, where he was treated for the multiple stab wounds and two skull fractures.

Following the attacks, officers recovered a five-inch-long makeshift metal knife from the recreation hall, and located an inmate in the showers who was covered with blood. Young was never able to identify his attackers, and no inmates were charged with his assault.

Young brought suit against the State of Maryland, DPSCS, Sergeant Wright, and Warden Dovey, asserting claims under Articles 16, 24, 25, and 26 of the Maryland Declaration of Rights and a claim against the State of an unconstitutional pattern or practice under *Longtin*. The complaint also asserted claims of negligent hiring, retention, training, and supervision, negligence and gross negligence, and battery.

### *Testimony Regarding Safety Measures*

At trial, Young elicited testimony from multiple witnesses regarding the creation and use of metal weapons by inmates. Warden Dovey testified that at the time of Young's attacks he was aware that inmates would take apart the metal lockers located in their cells and use the metal to make knives. Warden Dovey testified that prior to his arrival as warden, the metal shelving from the lockers had been removed because inmates would break up the shelving to make metal weapons. Sergeant Wright testified that it was "common knowledge" that inmates took metal from the lockers in their cells to make weapons. Lieutenant McKinley also testified that officers were aware that inmates would make weapons out of the metal lockers. Joseph Lohman, chief of security at MCTC, testified that in 2017, there were approximately thirty serious incidents of violence against

7

an inmate in which a weapon was reported as being used, and that sometimes, inmates would fashion weapons from the metal lockers inside the cells. The witnesses all acknowledged that the decision to use metal lockers instead of plastic or cloth bags was under the control of the State and not MCTC.

Young also elicited testimony regarding the staffing plan created by the State. At the time of Young's attacks, there were ninety-four inmates housed on his tier, with one officer assigned to supervise the entire tier. On December 25, 2017, Sergeant Wright was the sole tier officer. Sergeant Wright maintained that he was unable to come to Young's assistance because he would have been outnumbered by other inmates. Chief Lohman testified that a lack of staff and recruiting by the State necessitated that many prisoners be moved at once and agreed that having more staff and fewer inmates could improve the safety for officers and inmates alike. Chief Lohman further testified that typically, officers will respond to incidents once there are "adequate staff" present, and that a ratio of two officers to one inmate is desired.

### *The State's Designee*

On July 19, 2023, Young issued a subpoena to the State, directing that the State produce a corporate designee from DPSCS who would testify regarding (1) "detainee-on-detainee assaults or attacks in DPSCS facilities or failure to protect claims for which there was a settlement paid by the State or a jury verdict against the State during the period between 2000 and the present"; or (2) "detainee-on-detainee or officer-on-detainee assaults or attacks in DPSCS facilities for which there was a notice of claim sent or lawsuit filed during the period between 2000 and the present." Young cited eleven particular cases for

the designee to be prepared to discuss but indicated that the scope of questioning would not be limited to those eleven cases. On August 14, the parties exchanged emails limiting the scope of the testimony to a period of three years prior to Young's attacks and only regarding the cases specified by name. At this time, Young offered to depose the designee. The State declined to comply because discovery was over, and it was too close to trial which was set to begin on August 23, 2023.

The State filed a motion to quash the trial subpoena because the subpoena did not name a particular individual to be deposed. The State further contended that the Maryland Rules do not permit the trial subpoena of an unnamed designee and only permit the deposition of an unnamed corporate designee. The State noted that federal courts have held that the Federal Rules -- on which the Maryland Rules are based -- do not permit the issuance of a trial subpoena of a corporate designee. The State also alleged that the subpoena was "vastly overly burdensome and oppressive on its face," inasmuch as the scope covered a broad universe of potential allegations against the State. Young responded and a hearing was held shortly before trial. The court denied the motion to quash, finding the Maryland Rules differ from the Federal Rules, and permitted Young's issuance of a trial subpoena.

The State subsequently produced Laura Mullally, an Assistant Attorney General for the State of Maryland as its witness in response to the trial subpoena. Young sought to elicit from Ms. Mullally testimony demonstrating that the State engaged in a pattern or practice of unconstitutional behavior by failing to protect inmates. Ms. Mullally testified that in the three years prior to Young's attacks, there were seven incidents that resulted in

failure to protect lawsuits that were settled by the State. One additional case resulted in a judgment against the State for failure to protect an inmate. Ms. Mullally testified regarding the facts underlying four specific cases: one that resulted in a jury verdict of a failure to protect by the State; one that resulted in a jury verdict of a failure to protect and which ultimately settled; one that alleged a failure to protect that settled; and one that alleged a failure to protect but did not settle. Each of the four cases included facts that Young alleged were substantially similar to his case, including inmate-on-inmate violence, inmates waiting outside of cells for the doors to open, the use of sharp weapons, and officers who claimed they did not see the attacks transpire. The jury was specifically instructed that any evidence regarding other attacks or assaults offered by Ms. Mullally was relevant only to the pattern or practice claim against the State and should not otherwise be considered.

### *The Jury's Verdict and the State's Post-Trial Motions*

The jury found both Sergeant Wright and Warden Dovey negligent, and awarded Young $1,000,000 for each individual's negligence, amounting to an award of $2,000,000. Notably, the jury found that neither individual had violated Young's constitutional rights. Additionally, the jury found that the State "maintained an unconstitutional pattern, practice or policy of failing to protect incarcerated individuals, and that Plaintiff Michael Young was mentally or physically injured by this pattern, practice or policy." The jury awarded damages of $2,000,000 against the State on the *Longtin* pattern or practice verdict.

Following this verdict, the State moved for a new trial as well as judgment notwithstanding the verdict or reduction of the judgment against the State on the *Longtin* verdict, arguing that a *Longtin* claim cannot be brought against the State, and even if it

10

could, the evidence did not support an unconstitutional pattern or practice claim. The State further contended that the testimony of the State's designee was inadmissible, and the jury found no constitutional violation against Young. The individual defendants also sought judgment notwithstanding the verdict on the negligence claims, arguing that there was insufficient evidence to support the negligence findings, and pursuant to the MTCA, the individual defendants were immune from liability. Finally, the State requested that the damages awarded be reduced to $400,000, the cap under the MTCA.

In response, Young conceded that the "judgments against the individuals should be reduced . . . after application of the [MTCA]," but that there were two separate incidents, so the appropriate cap was $800,000. Young also argued that a constitutional violation is not subject to the MTCA cap, so the $2,000,000 verdict against the State on the *Longtin* claim should stand, for a total verdict of $2,800,000. The court denied the State's motion. This appeal followed.

## STANDARD OF REVIEW

We review a trial court's denial of a motion for a new trial for abuse of discretion. *Willis v. Ford*, 211 Md. App. 708, 714 (2013). A court's decision to admit evidence is subject to a two-part analysis to determine both the relevance and the admissibility of the evidence. *Akers v. State*, No. 7 Sept. Term 2024, 2025 WL 543463 at *9 (Md. Feb. 19, 2025). First, we review de novo whether the evidence was relevant. *Id*.[3] If we determine

---

[3] The Maryland Supreme Court recently engaged in a lengthy discussion revealing a lack of consensus within the Court regarding the appropriate standard of review for questions of relevance. *See Akers*, 2025 WL 543463 at *9 n.11, *31 n.10. The majority

11

that the evidence was relevant, we next review whether the trial court abused its discretion in admitting the evidence. *Id*. at *10; s*ee also Williams v. State*, 457 Md. 551, 563 (2018). ("[T]he circuit court's decision to admit relevant evidence is reviewed for an abuse of discretion."). "An abuse of discretion occurs where no reasonable person would take the view adopted by the circuit court." *Williams*, 457 Md. at 563.

We review the denial of a motion for judgment notwithstanding the verdict de novo. *Marrick Homes LLC v. Rutkowski*, 232 Md. App. 689, 697 (2017). We will reverse the denial of a motion for judgment notwithstanding the verdict "[i]f there is no rational ground under the law governing the case for upholding the jury's verdict[.]" *Stracke v. Estate of Butler*, 465 Md. 407, 420 (2019) (quoting *Bell v. Chance*, 460 Md. 28, 52 (2018)). "We will find error in a denial of a motion for judgment or [judgment notwithstanding the verdict] if the evidence does not rise above speculation, hypothesis, and conjecture, and does not lead to the jury's conclusion with reasonable certainty." *Scapa Dryer Fabrics, Inc. v. Saville*, 418 Md. 496, 503 (2011) (internal quotations omitted).

---

uses a two-part analysis requiring that relevance be reviewed de novo. *Id*. at *9-10 & n.11 (citing, among other cases, *Montague v. State*, 471 Md. 657, 673 (2020) ("First, we consider whether the evidence is legally relevant which is a conclusion of law that we review *de novo*."); *Portillo Funes v. State*, 469 Md. 438, 478 (2020) ("An appellate court reviews de novo a trial court's determination as to whether evidence is relevant."); *Ford v. State*, 462 Md. 3, 46 (2018) ("An appellate court reviews without deference a trial court's conclusion as to whether evidence is relevant."); and *Santiago v. State*, 458 Md. 140, 181 (2018) (noting that the consideration of whether evidence is legally relevant is reviewed for legal error).

# DISCUSSION

**I. The trial court erred when it denied the State's motion for judgment notwithstanding the verdict regarding the *Longtin* pattern or practice claim against the State.**

On appeal, the State argues that the trial court erred in denying its motions for a new trial, or, alternatively, its motions for judgment notwithstanding the verdict after the jury entered judgment on the *Longtin* unconstitutional pattern or practice claim against the State. The State alleged three errors by the trial court: 1) a *Longtin* claim may only be brought against municipalities and cannot be brought against the State; 2) the testimony of the State designee should not have been permitted; and 3) the *Longtin* claim cannot be maintained absent an underlying constitutional violation by the individual employees (Warden Dovey and Sergeant Wright), and even if it could, the evidence presented was insufficient to sustain a constitutional claim. We will address each of these arguments in turn, ultimately concluding that the *Longtin* verdict against the State should be reversed.

**A. A *Longtin* pattern or practice of unconstitutional conduct claim may be brought against the State.**

First, the State argues that a *Longtin* claim cannot be brought against the State because Maryland law only recognizes a pattern or practice claim of constitutional violations against local governments and not the State. In response, Young contends that *Longtin* does not explicitly restrict a pattern or practice claim to local governments; rather, the Court simply did not contemplate bringing a pattern or practice claim against the State

at that time. For the reasons that follow, we hold that an unconstitutional pattern or practice claim -- a *Longtin* claim -- may be brought against the State.[4]

*Longtin* involved the wrongful accusation and arrest of the plaintiff, Keith Longtin, for the rape and murder of his wife. 419 Md. at 459. After reporting his wife missing, Longtin was taken to a police station for interrogation. *Id*. What followed was a lengthy interrogation of at least twenty-seven hours, during which Longtin was unable to sleep. *Id*. Approximately twenty hours into the interrogation, Longtin answered a series of "what-if" questions that asked him to imagine how the murder occurred. *Id*. at 460. Longtin's answers were treated as a confession, and he was arrested shortly thereafter. *Id*. at 460-61. Longtin was imprisoned for over eight months, during which police obtained DNA evidence which excluded Longtin as the perpetrator. *Id*. at 462. Longtin was not notified of the exculpatory DNA evidence, and remained incarcerated for six months after the DNA was obtained until police apprehended the actual perpetrator. *Id*.

Longtin alleged that the Prince George's County Chief of Police and Criminal Investigation Division "'maintained a policy of unconstitutional and unlawful detention and interrogation' and that his arrest and detention were not 'a single isolated, accidental, or peculiar event[.]'" *Id*. at 490. Longtin elicited testimony of the officers' improper

---

[4] Although Maryland law has not yet recognized that *Longtin* applies to the State, we have previously considered this precise issue in an unreported opinion, *State v. Wallace*, 2022 WL 2282705 (Md. Ct. Spec. App. June 23, 2022). *Wallace* is an unreported opinion published before July 1, 2023, and, therefore, may not be cited as persuasive authority pursuant to Maryland Rule 1-104(a)(2)(B). Our independent analysis of the issue, however, leads us to the same conclusion as we reached in *Wallace*.

investigation methods against himself and others, and evidence of official policies that encouraged constitutional violations, indicating that Longtin's treatment was not an isolated event. *Id*. at 497-98.

Longtin's claim largely parallels a "*Monell* claim," the federal equivalent of a pattern or practice claim. *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658 (1978). In *Monell*, employees challenged the official policies of the Department of Social Services and the Board of Education of the City of New York, which required pregnant employees to take unpaid leaves of absence before medically required. *Id*. at 660-61. The Supreme Court held that a municipality is considered a "person" and may be sued directly under 42 U.S.C. § 1983[5] for its employees' actions only when the official policy or custom of the municipality "'causes' an employee to violate another's constitutional rights." *Id.* at 689.

In *Monell*, the United States Supreme Court unequivocally held that a municipality has no *respondeat superior* liability for the actions of its employees. 436 U.S. at 691 ("[W]e conclude that a municipality cannot be held liable *solely* because it employs a

___

[5] Section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

15

tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.").  Notably, this is where Maryland law and federal law diverge.  Indeed, the Maryland Supreme Court has disagreed, holding that "Maryland's constitution requires more of its municipalities, and accordingly this Court has declined to shield municipalities from the unconstitutional acts of its officials."  *Longtin*, 419 Md. at 493 (citing *DiPino v. Davis*, 354 Md. 18 (1999)).  The Court in *Longtin* acknowledged that it had previously extended *respondeat superior* liability to municipalities in *DiPino*.  *Id*. at 494 (citing *DiPino*, 354 Md. at 51-52).

In *DiPino*, the Court noted that although federal law under § 1983 and the rights afforded under the Maryland State Constitution were "essentially parallel, the rules relating to redress for the violation of those rights are very different."  354 Md. at 45.  In explaining its decision to extend *respondeat superior* liability to municipalities, the Court relied heavily on a New York case, *Brown v. State*, 89 N.Y.2d 172 (1996), in which the New York Court of Appeals held that the State was vicariously liable for the constitutional torts committed by its employees.  *DiPino*, 354 Md. at 52-53.  In its reasoning, the New York Court of Appeals stated that:

> [T]he State is appropriately held answerable for the acts of its officers and employees because it can avoid such misconduct by adequate training and supervision and avoid its repetition by discharging or disciplining negligent or incompetent employees.  Moreover, there is no reason why the deterrent value of holding the State answerable for an actionable assault by one of its employees is warranted but the deterrent value of holding it liable for an employee's constitutional tort is not.

*DiPino*, 354 Md. at 53 (quoting *Brown*, 89 N.Y.2d at 223).

16

The Maryland Supreme Court specifically adopted the reasoning of the New York Court of Appeals, stating "[w]e assume, although the opinion did not address the subject, that the same rule would apply to local governments." *DiPino*, 354 Md. at 52. The Court continued, noting that:

> [a]s a matter of common law, we can find no principled basis not to apply the doctrine of *respondeat superior* to State Constitutional violations for which a common law action for civil damages would lie. We adopt as our rationale—as our explanation for what we have consistently done—the view of the New York court in that regard.

*Id.* at 53.

It follows that the Court in *DiPino* would have extended *respondeat superior* liability to the State. Indeed, because *Longtin* heavily relied on *DiPino* in its own analysis, *Longtin* logically would apply to the State as well. In *Longtin*, the Court observed:

> In *DiPino*, we held that, unlike federal law, Maryland's constitution imposed an affirmative obligation to avoid constitutional violations by its employees through "adequate training and supervision" and by "discharging or disciplining negligent or incompetent employees." Clearly, if Maryland imposes on local governments an obligation to prevent unconstitutional conduct by its employees, those same governments may not, with impunity, **cause** such conduct by unconstitutional polices or practices.

419 Md. at 495. Accordingly, the Maryland State government also has an obligation to prevent unconstitutional conduct by its employees and is answerable for the misconduct of its employees. We, therefore, conclude that the State may not cause such conduct through its policies or practices that are unconstitutional.

17

"[G]iven the almost uniquely expansive reach of Maryland's constitutional tort remedy, where no official or local governmental immunity is possible . . . we think it highly unlikely that Article 24 contains any exemption from liability for an unconstitutional pattern or practice." *Id*. at 491-92 (quoting *Longtin v. Prince George's Cnty*, 190 Md. App. 97, 130-31 (2010)). We read nothing in *Longtin* to limit an unconstitutional pattern or practice claim to local governments. Accordingly, we hold that *Longtin* applies to the State for any constitutional deprivations that are caused by either its own actions or that of its employees. As in *Longtin*, Young's claims are "merely a more egregious subset of the actions that are prohibited by Maryland constitutional law[,]" *id*. at 495, and the State must similarly be answerable.

The State contends that *Longtin* should only apply to municipalities and references several federal cases to support this proposition.[6] As noted, the Maryland Supreme Court

---

[6] The State directs our attention to *Rosa v. Board of Educ. of Charles County, Md.*, No. AW-11-02873, 2012 WL 3715331 (D. Md. Aug. 27, 2012). In *Rosa*, the court dismissed the complainant's *Longtin* claim on Eleventh Amendment grounds, noting that "[t]he [*Monell*] Court expressly limited its holding to local government units which are not considered part of the State for Eleventh Amendment purposes." *Id*. at *9. The court continued, noting that "the *Longtin* court neither stated nor intimated that plaintiffs could institute pattern or practice claims against state government agencies." Notably, the *Longtin* court was not asked to contemplate such a question. *Id.* at *10. Indeed, the Maryland Constitution contains no analog to the Eleventh Amendment, and as such, *Rosa* is unconvincing. The other cases cited by the State rely heavily on *Rosa* or dismissed the complainant's *Longtin* claim for other reasons. *See, e.g.*, *Brummell v. Talbot County Bd. of Educ.*, No. CV RDB-22-1601, 2023 WL 2537438, *6 (D. Md. Mar. 16, 2023) (discussing *Rosa*); *Reid v. Munyan*, No. WMN-12-1345, 2012 WL 4324908, *5 (D. Md. Sept. 18, 2012) (dismissing for failure to state a claim and discussing *Rosa*); and *L.J. v. Baltimore Curriculum Project*, 514 F. Supp. 3d 707, 714 (D. Md. 2021) (dismissing "on common law sovereign immunity grounds" and discussing *Rosa*). Similarly, we find these cases unpersuasive.

18

has held that Maryland law is much more demanding than federal law in assigning liability, and Maryland constitutional claims are not treated the same as claims under § 1983. *Longtin*, 419 Md. at 496 ("As we clearly stated in *DiPino*, Maryland's constitutional protections require more from public officials and municipalities than § 1983, and the rules and procedures of applying them are divergent from the federal rules."). Thus, in our view, the State's reliance on federal law is unpersuasive.

Municipalities have long been held liable for encouraging the unconstitutional practices of their employees. It follows that the State should similarly be liable if its policies encourage employees to engage in actions that violate constitutional rights. We decline the State's invitation to read *Longtin* as explicitly limiting pattern or practice liability to only local governments. As such, an individual may, under appropriate circumstances, bring an unconstitutional pattern or practice claim against the State.

The State next argues that the trial court erred in denying the motion for judgment notwithstanding the verdict on the *Longtin* claim because the jury relied on the impermissible testimony of Ms. Mullally, the State designee, to establish evidence of the State's unconstitutional pattern or practice. The State argues that Ms. Mullally's testimony was impermissible because she is an organizational designee that was improperly subpoenaed over the State's objection, and that her testimony was not relevant and was therefore inadmissible.

The State first argues that Ms. Mullally's testimony is inadmissible because she is an organizational designee, and an unnamed organizational designee may not be subpoenaed for trial. Maryland Rule 2-510 governs the subpoena of a "person" to testify

19

at court proceedings. The State argues that Young was required to issue a subpoena to depose an organizational designee selected by the State. Young needed to issue a notice that "describe[d] with reasonable particularity" the scope of the deposition, and the State must then "designate one or more . . . persons . . . who will testify on its behalf regarding the matters described." Md. Rule 2-412(d). Once the organizational designee was identified and deposed, Young could issue a trial subpoena for that specific named individual to testify at trial. Young counters that the State is reading Rule 2-510 too specifically, and because Maryland's definition of the term "person" includes "the State, its agencies or political subdivisions," the trial subpoena was sufficient to serve the State with notice that it name an individual to testify at trial. Md. Rule 1-202(u).

We need not determine whether the subpoena was proper in light of our ultimate holding that Young did not provide sufficient evidence through Ms. Mullaly's testimony to establish a *Longtin* claim against the State. Nevertheless, we encourage parties to subpoena and depose organizational designees sufficiently in advance of trial to avoid chaos and confusion at trial.[7] For this and other reasons, federal courts have declined to

---

[7] Young issued the subpoena on July 19, 2023. The trial was scheduled to begin on August 23, 2023. On August 14, the State notified Young for the first time via email that it intended to file a motion to quash the subpoena. Young responded, offering to depose the designee during the nine remaining days prior to trial. Although Young offered to depose the State's designee, the State rejected this overture because discovery had concluded, and the timing of the request was, according to the State, too close to trial. The State filed its motion to quash on August 15. Young responded shortly thereafter on August 21. The trial court heard arguments prior to trial on August 23, and denied the State's motion to quash.

allow a similar process using Federal Rule 30(b)(6) and Rule 45, from which Maryland Rules 2-412(d) and 2-510 respectively are derived.[8]

In addition, the State contends that Ms. Mullally's testimony should have been excluded because evidence about prior jury verdicts against the State was not relevant and was therefore inadmissible. Young counters that these cases were all relevant because they contained factual similarities of inmate-on-inmate violence, the opening of cell doors, and prior warnings that attacks may occur.

The State lodged frequent objections throughout Ms. Mullally's testimony regarding the relevance of the verdicts she referenced in her testimony. When the State objected to the relevance of Ms. Mullally's testimony, the court properly responded: "How else would you prove pattern and practice without going through the history of claims? How else do you prove pattern and practice?" For the reasons that follow, we agree with the trial court and hold that the court did not err in admitting Ms. Mullally's testimony regarding jury verdicts against the State.

Relevant evidence is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5-401. To establish a *Longtin* claim,

---

[8] *See, e.g.*, *Ferrin v. Experian Info. Sols., Inc.*, No. 20-CV-841, 2023 WL 3588351, *1 (D. Minn. Apr. 27, 2023) (holding that "Rule 30(b)(6) may not be used in conjunction with Rule 45 to serve a subpoena on a corporation for purposes of securing trial testimony without naming a particular individual" (internal quotations omitted)); *Rennenger v. Manley Toy Direct L.L.C.*, No. 410CV00400RELRAW, 2015 WL 13981436, *1 (S.D. Iowa Apr. 16, 2015) ("Requiring organizations to designate Rule 30 (b)(6) trial witnesses would in many cases greatly complicate the final pretrial process by moving those disputes to just before trial.").

Young was required to present evidence showing that the State had engaged in a pattern or practice of violating the constitutional rights of inmates in its care. The way Young chose to do this was to highlight other instances where the State had been accused of violating the constitutional rights of inmates.

Ms. Mullally testified regarding two cases, namely *Rodriguez*[9] and *Wallace*.[10] The State argues that neither of these cases is relevant, and that "[t]he only connection between the conduct in *Rodriguez* and *Wallace* and the conduct alleged by Young was that the State was involved." *Rodriguez* was a failure to protect case involving the murder of an inmate on a prison bus while the nearby supervising officer was either asleep or "watching and not performing his duty." 443 Md. at 710. The inmate who attacked the victim had previously commented that "the killing had just begun[,]" a warning in advance that violence may possibly occur. *Id*. at 689. Young alleged that his injury occurred because Sergeant Wright opened his cell door either intentionally or because he was not paying attention and did not notice the inmates standing outside the cell. Young further alleged that his letter was a similar warning in advance that violence may occur. In our view, the trial court did not err in its determination that this testimony was relevant.

*Wallace* involved a failure to protect case concerning an inmate-on-inmate attack in a cell where the door was opened, allegedly intentionally, via a lockbox controlled by a supervising tier officer. 2022 WL 2282705 at *4. The mother of the inmate who was

---

[9] *Rodriguez v. State*, 218 Md. App. 573 (2014), *aff'd Cooper v. Rodriguez*, 443 Md. 680 (2015).

[10] *State v. Wallace*, 2022 WL 2282705 (Md. Ct. Spec. App. June 23, 2022).

attacked had previously contacted the jail to express concern for her son's safety after observing him injured from a previous assault. *Id*. at *2. Young alleged that his injury was due to the unlocking of his cell door, which at the time was only able to be opened by the tier officer, Sergeant Wright. Young had expressed a fear he would be harmed following a previous assault. It was, therefore, reasonable for the court to deem this testimony relevant.

The State further argues that Ms. Mullally's testimony regarding settlements should not have been admitted as settled cases cannot be used to prove a plaintiff's claim because the claims are merely disputed and they have not been adjudicated by a trier of fact. Maryland Rule 5-408(a)(1) provides that: "furnishing . . . a valuable consideration for the purpose of compromising . . . any other claim" "is not admissible to prove the validity . . . of a civil claim in dispute." Because we ultimately conclude that the evidence produced by Young -- including Ms. Mullally's testimony -- was insufficient to establish a *Longtin* claim against the State, we need not decide whether the trial court erred in admitting the testimony of previous settlements by the State.[11]

B. **Young did not present sufficient evidence to sustain a *Longtin* verdict against the State.**

Finally, the State argues that the trial court erred in failing to grant its motion for judgment notwithstanding the verdict because a *Longtin* claim necessitates an underlying

---

[11] Nothing in this opinion should be construed that we condone the efforts by Young to admit into evidence settlements by the State to establish a pattern or practice claim. We need not decide this issue in light of our holding that Young did not present sufficient evidence to establish a *Longtin* claim against the State.

23

violation of a claimant's constitutional rights. The State further contends that the evidence presented by Young was insufficient to sustain a constitutional claim. Because the jury specifically found that Sergeant Wright and Warden Dovey had not violated Young's constitutional rights, the State contends that the *Longtin* verdict cannot survive.

To prove a *Longtin* claim, the State argues, "a plaintiff must prove both (1) the 'constitutional deprivation in his case'; and (2) the underlying pattern or practice, i.e., that 'his experience was not an isolated incident.'" Young phrases the requirements slightly differently, arguing that "all a *Longtin* claim requires is (1) an unconstitutional policy or practice, (2) that causes Plaintiff's injuries." Both of these statements reflect the two factors necessary to sustain a *Longtin* pattern or practice claim: the plaintiff must prove that 1) the government entity maintained an unconstitutional pattern or practice, and 2) the specific unconstitutional pattern or practice resulted in the plaintiff's injury. *Longtin*, 415 Md. at 496-97.

The State essentially argues that without a finding of a constitutional violation committed by either Sergeant Wright or Warden Dovey, the *Longtin* verdict cannot stand. In the written verdict sheet submitted after the trial in this case, the jury expressly found that neither Officer Wright nor Warden Dovey "violated Michael Young's rights under the Maryland Constitution by failing to protect him, causing him mental and/or physical injury." The question remains whether a *Longtin* verdict against the State can be upheld in the absence of a jury finding of a deprivation of one's constitutional rights by the officers. Our research -- thorough we trust -- has not unearthed a single case where the

24

State has been held liable notwithstanding the absence of such a constitutional violation by the officers.

Although in *Longtin*, individual officers were found to have committed actions that violated Longtin's constitutional rights, that was because the unconstitutional practice of the Prince George's County Police Department was necessarily effectuated through the actions of its employees. If *Longtin* required an unconstitutional action by the employee as well, it would effectively be no different than *respondeat superior* liability, which Maryland has already held applies to municipalities. *See DiPino*, 354 Md. at 51-52 (holding that "local governmental entities do, indeed, have *respondeat superior* liability for civil damages resulting from State Constitutional violations committed by their agents and employees within the scope of the employment.").

The State argues that without a constitutional violation by the officers against Young, the *Longtin* verdict cannot survive. Critically, the jury *did* find that a constitutional violation was committed against Young. The jury specifically found that the State "maintained an unconstitutional pattern, practice or policy of failing to protect incarcerated individuals, and that Plaintiff Michael Young was mentally or physically injured by this pattern, practice or policy." We, therefore, review the record to determine whether there was sufficient evidence to support such a finding. Under the unique circumstances of this case, we conclude that even if the trial subpoena was valid and all of Ms. Mullally's testimony was otherwise admissible, Young did not present sufficient evidence to support the jury verdict that the State maintained a pattern or practice of violating constitutional rights of inmates through the presence of metal lockers in inmate cells and an inadequate

25

staffing plan. As a result, the circuit court erred in denying the State's motion for judgment notwithstanding the verdict on the *Longtin* pattern or practice claim.

To establish a *Longtin* pattern or practice claim, Young introduced evidence through Ms. Mullally's testimony that there had been other incidents of failure to protect on the part of the State that resulted in harm to inmates. As we addressed previously, the cases that Ms. Mullally relied upon concerned inmate-on-inmate violence that was either the result of the failure of correctional officers to observe and intervene in an attack on a bus,[12] or was the result of an officer opening a cell door which allowed an attack to occur.[13] In both instances, the jury found that the State failed to protect inmates, and that failure was specifically due to the fault of correctional officers and not the State.

In our view, *Rodriguez* and *Wallace* are distinguishable because the conduct of the officers was directly tied to the State's failure to protect. In *Rodriguez*, three officers were found to be negligent, while another officer was found to be grossly negligent, and the officers' conduct was the proximate cause of the inmate's death. 443 Md. at 704. In *Wallace*, the State was liable for failing to protect the inmate from an attack and for the negligent training or supervision of employees because the employees' actions were a direct or proximate cause of Wallace's injuries. 2022 WL 2282705 at *7. In both instances, the negligence of the State's employees was the direct cause of the constitutional violation. Neither of those cases addressed assault with a weapon made from materials in

---

[12] *Rodriguez*, 443 Md. at 703-05.

[13] *Wallace*, 2022 WL 2282705 at *3, 7.

26

the inmates' lockers, nor addressed allegations of an insufficient staffing plan. Notably, both cases involved negligence on the part of particular officers or the State's retention of those officers.

In contrast, although both Warden Dovey and Sergeant Wright were ultimately found negligent in Young's case, the jury expressly found that neither of their negligent actions violated Young's constitutional rights. At trial, Young relied on evidence that the State, in failing to remove the metal lockers from the inmates' cells and in establishing a staffing plan that permitted a 94-to-one ratio of inmates to tier officers, had implemented policies that led to a violation of his constitutional rights. These State actions, however, speak to a pattern that is wholly unlike the pattern Young sought to establish with the *Rodriguez* and *Wallace* cases.

To establish a *Longtin* pattern or practice claim against the State, independent of officer behavior, Young needed to provide evidence sufficient to show that the cause of his injury was the State's unconstitutional pattern or practice. At trial, Young did not provide sufficient evidence to establish a pattern or practice related to the State's policies on staffing or providing metal lockers to satisfy liability of the State under *Longtin*. Indeed, no expert testified regarding the danger of failing to remove metal lockers or the inadequacy of the staffing plan. Further, Young did not offer evidence connecting the injuries he received to the State's alleged unlawful pattern or practice. Accordingly, this evidence "does not lead to the jury's conclusion with reasonable certainty" connecting the specific failure of the State to protect him from harm. *Saville*, 418 Md. at 503.

27

For these reasons, we hold that while a *Longtin* unconstitutional pattern or practice claim may be brought against the State, in order to sustain such a claim, Young was required to present evidence sufficient to connect the specific failure of the State to protect the inmate from harm with the previous instances of the failures to protect. Because the evidence Young produced did not "rise above speculation, hypothesis, [or] conjecture," *id.*, the trial court erred in denying the State's motion for judgment notwithstanding the verdict on the *Longtin* claim. We, therefore, reverse the pattern or practice judgment against the State.

## II. The trial court did not err in denying the motion for judgment notwithstanding the verdict regarding the negligence verdicts against Sergeant Wright and Warden Dovey.

The State argues that the evidence against both Sergeant Wright and Warden Dovey was insufficient to support a finding of negligence, and, therefore, the trial court erred when it denied the motions for judgment notwithstanding the verdict regarding the negligence by Sergeant Wright and Warden Dovey. The State argues that the attacks on Young were not reasonably foreseeable by either Sergeant Wright or Warden Dovey, and, therefore, the negligence verdicts cannot be upheld. Young counters that not only were the attacks on Young foreseeable by Warden Dovey (who received a letter from Young expressing fear for his safety) and Sergeant Wright (who should have seen the five inmates outside of Young's cell prior to opening his door if he had been paying attention), they were actually witnessed in real time by Sergeant Wright who failed to intervene.

A finding of negligence requires "1) that the defendant was under a duty to protect the plaintiff from injury, 2) that the defendant breached that duty, 3) that the plaintiff

28

suffered actual injury or loss, and 4) that the loss or injury proximately resulted from the defendant's breach of that duty." *Steamfitters Local Union No. 602 v. Erie Ins. Exch.*, 469 Md. 704, 727 (2020). A negligence claim cannot be sustained absent any of the four requirements.

The first requirement is that the defendant be under a duty to protect the plaintiff from harm. The duty element is particularized, and focuses "not on whether the [defendant] owed a duty in the abstract . . . , but [on] whether the [defendant] owed a duty specifically to the plaintiff[.]" *Hancock v. Mayor & City Council of Baltimore*, 480 Md. 588, 605 (2022). One such instance of a special relationship that creates a duty to protect is between an officer and an inmate. *Rodriguez*, 443 Md. at 710, 712 (noting that officer "fail[ed] to perform his duty to protect" the inmate and "failed to fulfill the duty to ensure [the inmate's] safety" when he did not observe or prevent the prison bus attack resulting in inmate's death). We have previously stated:

> Ordinarily, courts will not impose an affirmative duty to protect the interests of another, absent a special relationship between the parties. *See* [W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 56, at 373-75 (5th ed. 1984)]. That special relationship existed here; when the State incarcerates an individual, the inmate is entirely dependent on the State, which has exclusive control over the care and confinement of prison inmates. See *Prosser* § 56, at 376 (the special relationship between a jailer and his prisoner justifies imposing a duty to protect prisoners).

*State v. Johnson*, 108 Md. App. 54, 65 (1996).

This special relationship was present here between Young and the correctional officers in charge of Young's care at MCTC, including Warden Dovey and Sergeant

29

Wright. Even so, as the federal district court of Maryland has held, although prison officials "ha[ve] a general duty to exercise ordinary diligence to keep inmates safe and free from harm . . . [t]hat duty does not encompass the notion that every injury, of any degree that befalls a federal prisoner is compensable[.]" *Beckwith v. Hart*, 263 F. Supp. 2d 1018, 1022-23 (D. Md. 2003). Officers have a duty, therefore, only to protect inmates from "what is reasonable or foreseeable under the circumstances." *Id*. at 1023. Thus, the duty determination must be a fact-specific inquiry into whether the harm to a defendant was reasonably foreseeable under the circumstances.

We first address whether the attacks on Young were reasonably foreseeable to either Sergeant Wright or Warden Dovey. Finding that the attacks were reasonably foreseeable, we then address the remaining three factors to determine whether Young presented sufficient evidence to generate a jury issue on both negligence claims.

A.      **There was sufficient evidence to prove negligence on the part of Sergeant Wright.**

First, we address whether the attacks on Young were reasonably foreseeable by Sergeant Wright. Sergeant Wright testified that the tier officer in the control panel box is tasked with observing any movement on the tier to make sure inmates are safe. Warden Dovey testified that Sergeant Wright would have had a "pretty good line of sight" from the control panel box. Lieutenant Shank agreed that if the tier officer was looking down the tier at a given cell, "if three people enter a cell, a reasonable officer [looking down the tier] would be expected to see that."

30

The jury heard testimony from another inmate that he saw "four or five guys on the outside of [Young's] cell" immediately prior to the attack in Young's cell. The State inexplicably contends that this does not suggest that Sergeant Wright observed or should have observed the inmates outside of Young's cell before opening his cell door or anticipated any harm would befall Young. At a time when all individuals should have been either in their cells or in the recreation hall, it defies logic to infer that Sergeant Wright would not have noticed a group of inmates outside of Young's cell if he was paying attention. The role of the tier officer is to observe the tier to ensure inmate safety. It was not "speculation, hypothesis, [or] conjecture" for the jury to determine that Sergeant Wright should have reasonably foreseen that when there was a group of inmates standing outside of Young's cell, opening the cell door could result in harm to Young. *Saville*, 418 Md. at 503.

Second, Young must prove that Sergeant Wright breached his duty to Young. In our view, Young presented sufficient evidence that Sergeant Wright breached his duty to protect Young from harm by opening the cell door -- which was to remain locked at all times -- while a group of inmates was standing outside of the cell waiting to enter. Third, it is undisputed that as a result of the inmates attacking him in his cell, Young suffered seventeen stab wounds and potentially other injuries as well.

Finally, there was evidence presented that Sergeant Wright's actions were arguably the proximate cause of Young's injuries. "To be a proximate cause for an injury, 'the negligence must be 1) a cause in fact, and 2) a legally cognizable cause.'" *Pittway Corp. v. Collins*, 409 Md. 218, 243 (2009) (quoting *Hartford Ins. Co. v. Manor Inn*, 335 Md. 135,

31

156-57 (1994)). To be a cause in fact, the defendant's actions must have produced an injury. *Pittway Corp.*, 409 Md. at 244. If only one negligent act is at issue, the defendant's actions must be the "but-for" cause of the plaintiff's injury, i.e. "but for" the negligent actions of the defendant, the plaintiff would not have been injured. *Id*. To be a legally cognizable cause, the injury complained of must fall within the "general field of danger that the actor should have anticipated or expected." *Id*. at 245. The injury must therefore be reasonably foreseeable as a possible outcome of the defendant's conduct.

The State argues that Sergeant Wright's negligent action of opening the cell door was not a but-for cause of the harm to Young, because the intervening acts of the attackers are what caused Young's actual injury. We disagree. But for Sergeant Wright's negligent action of opening Young's cell door while a group of inmates was standing directly outside, Young would not have been injured. Sergeant Wright's actions are arguably the cause in fact of Young's harm. The policy that cell doors remain locked at all times is a mechanism to ensure the safety of inmates and officers alike. It is well within the field of danger that Sergeant Wright should have anticipated that unlocking a cell door while an inmate was inside could result in a harm being inflicted on the inmate. The jury found that Sergeant Wright was negligent in unlocking the door to Young's cell. We cannot conclude that there was "no rational ground under the law governing the case for upholding the jury's verdict[.]" *Stracke v. Estate of Butler*, 465 Md. 407, 420 (2019). The circuit court, therefore, did not err in denying the State's motion for judgment notwithstanding the verdict on the negligence finding against Sergeant Wright.

32

**B.     There was sufficient evidence to prove negligence on the part of Warden Dovey.**

Similarly, we address whether the attacks on Young were reasonably foreseeable by Warden Dovey. At trial, Young introduced evidence that he had previously complained to Warden Dovey that he felt that his safety was in danger. Young penned a letter to Warden Dovey, which was received in March 2017. In the letter, Young expressed that he was attacked by his cellmate, who allegedly stated that "the [correctional officer] told him to do it because of what happened at MCIH" and Young now feared for his safety. Warden Dovey testified that "any time anyone . . . says they fear for their safety, there's going to be an investigation by someone," and that Young should have been placed in administrative segregation. Nevertheless, an investigation never occurred. Upon receipt of the letter which expressed Young's safety concerns, Warden Dovey had a duty to protect Young by, at the very least, investigating whether his fears were credible, as it was reasonably foreseeable that Young, who stated he feared for his life, could be harmed. Second, Warden Dovey's failure to investigate or oversee an officer designated to investigate the matter constituted a breach of his duty. Third, it is undisputed that Young was actually injured.

Finally, Warden Dovey's action in failing to properly respond to Young's letter and concerns was arguably a proximate cause of his injury. As Warden Dovey testified, Young could have been "placed some place safe in the facility [like] administrative segregation" if the investigation found that Young's fear for his safety was credible. Assuming he was in administrative segregation, Young would not have been attacked by the other inmates

33

on his tier. But for Warden Dovey's failure to investigate Young's concerns over his safety and place him in administrative segregation, Young arguably would not have been attacked.

The attack was also a legally cognizable harm: it was within the field of danger that Warden Dovey should have anticipated that failing to investigate an inmate's complaint that he fears for his safety and failing to take action to protect that inmate could result in injury to the inmate. The jury found that Warden Dovey was negligent in failing to properly investigate after Young expressed in his letter that he feared for his life after being attacked the first time. Under the circumstances, we cannot conclude there was "no rational ground under the law governing the case for upholding the jury's verdict[.]" *Stracke*, 465 Md. at 420. Thus, the circuit court did not err in denying the State's motion for judgment notwithstanding the verdict on the negligence finding against Warden Dovey.

**III. The trial court did not err in declining to reduce Young's damages to $400,000.**

**A. The attacks against Young constitute two separate incidents and under the MTCA, Young's damages are capped at a total of $800,000.**

The MTCA waives the immunity of the State in a tort action and provides that "[t]he liability of the State and its units may not exceed $400,000 to a single claimant for injuries arising from a single incident or occurrence." Md. Code, State Government Article § 12-104(a)(2) (1984, 2021 Repl. Vol.).[14] Neither the MTCA, nor any other legislation, define what qualifies as an "incident or occurrence."

_____

[14] The cap has since been raised to $445,000 per incident but the cap of $400,000 per incident applies because that was the cap in effect at the time of the incident on December 25, 2017.

The State argues that the attacks against Young should be considered "a single incident" under the MTCA. Young contends that the attack in Young's cell and the attack in the recreation hall constitute two separate incidents and the appropriate cap should be $400,000 per incident for a total of $800,000.

The State argues that because Young filed one complaint in which he repeatedly referred to an "attack," and did not ask the jury to distinguish between the attack in his cell and the attack in the recreation hall, the jury made no finding that two attacks occurred. Young maintains that he was first attacked in his cell by one group of inmates who used weapons. He further argues that the attack stopped and he was free to move to the recreation hall and was not pursued by his assailants. Once in the recreation hall, he was attacked by a second and different group of inmates, none of whom used weapons. As such, he argues that there were two separate "incidents" or "occurrences" for purposes of the MTCA.

The uncontroverted testimony in this case reflects that one attack took place in Young's cell and that attack, without equivocation, ceased and Young was no longer attacked at the time he sought Sergeant Wright's assistance. It is undisputed that when Sergeant Wright first saw Young on the tier, he was not actively being attacked nor was he pursued. Indeed, Sergeant Wright admitted that after the first attack, Young "walked into the Rec Hall, went behind the partition where the toilet is and another altercation occurred." Accordingly, under the unique facts of this case, there were two separate "incidents" or "occurrences."

35

Notably, in the context of the LGTCA, which is substantially similar to the MTCA, "[a] single occurrence may be considered to encompass all claims stemming from one proximate cause [or] may be defined as the event which triggers liability[.]" *Bd. of Cnty. Comm'rs of St. Mary's Cnty. v. Maras, LLC*, 415 Md. 676, 690 (2010) (holding that appellee's multiple tort claims from alleged migration of toxic substances from county landfill constituted one claim for the purposes of the LGTCA). The Court held that "continuous and repeated acts of negligence may constitute the 'same occurrence.'" *Id*. at 692. Nevertheless, the uncontroverted facts adduced at the trial in this case were that the attacks were not continuous and the allegations of negligence for each attack differed significantly.

The State contends that Young provided notice to the State of a single "claim." Critically, the Complaint does not contain such a reference, nor does it refer to a single attack. Indeed, the Complaint provides that Young was "attacked again" and described the two assaults on Young that occurred in two distinct places.

The record reflects that there were two different groups of attackers, the first possessing weapons while the second group of attackers at a different location possessed no weapons. Notably, Sergeant Wright acknowledged that the first attack had ceased. When Young entered the recreation hall, he was the only person that was bloodied. After the attack in the recreation hall, the security personnel ultimately intervened.

Our inquiry is driven by the evidence at trial, not the notice letter or the Complaint filed in this case. Based on the evidence presented at trial, the trial court did not err in failing to cap the State's liability at $400,000.

**CONCLUSION**

We hold that a *Longtin* unconstitutional pattern or practice claim may be brought against the State. Nevertheless, under the unique circumstances of this case, the trial court erred in denying the State's motion for judgment notwithstanding the verdict on Young's *Longtin* claim because Young did not produce sufficient evidence to support a finding that the State maintained a pattern or practice of violating the constitutional rights of inmates. We, therefore, reverse the *Longtin* judgment against the State.

Additionally, we hold that the trial court did not err in denying the State's motion for judgment notwithstanding the verdict on the negligence claims against either Warden Dovey or Sergeant Wright. Finding that both individuals were negligent, the court properly entered judgment against each party. Because the evidence presented at trial demonstrated that there were two separate attacks and therefore two separate incidents or occurrences, the appropriate cap on the damages allowed to Young under the MTCA is $800,000. We, therefore, affirm the negligence findings against Warden Dovey and Sergeant Wright and remand to the trial court to enter judgment caping the State's liability at $800,000.

> **JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED IN PART AND REVERSED IN PART. COSTS TO BE PAID TWO-THIRDS BY APPELLANT AND ONE-THIRD BY APPELLEE.**

37